**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARCUS REYMOND ROBINSON,
          *Petitioner-Appellant,*

v.

MARVIN L. POLK, Warden, Central
Prison, Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 05-1

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CA-00-127-5-F-HC)

Argued: September 22, 2005

Decided: February 14, 2006

Before WILLIAMS, KING, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Williams wrote the majority
opinion, in which Judge Shedd joined. Judge King wrote a separate
opinion dissenting in part.

## COUNSEL

**ARGUED:** Kevin Patrick Bradley, Durham, North Carolina; Geoffrey Wuensch Hosford, HOSFORD & HOSFORD, P.C., Wilmington, North Carolina, for Appellant. Valerie Blanche Spalding, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy

Cooper, Attorney General of North Carolina, William N. Farrell, Jr., Senior Deputy Attorney General, Raleigh, North Carolina, for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

Marcus Reymond Robinson, a North Carolina death-row inmate, appeals the district court's denial of his habeas petition filed under 28 U.S.C.A. § 2254 (West 1994 & Supp. 2005). We granted a certificate of appealability to consider two claims raised by Robinson: (1) that the trial court's jury instructions during the guilt phase of his trial violated the Eighth Amendment; and (2) that a juror's recitation of a Biblical passage during sentencing deliberations violated the Sixth Amendment. Applying the deferential standard of review required by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we conclude that the North Carolina court's decision denying Robinson relief on these claims was not an unreasonable application of clearly established federal law. Accordingly, we deny Robinson's petition and his request for an evidentiary hearing on his Bible claim.

I.

The facts are set forth adequately in the order of the North Carolina Superior Court (MAR court) denying Robinson's motion for appropriate relief (MAR):

> The State's evidence at trial tended to show that on the morning of 21 July 1991, seventeen year old Erik Tornblom did not return home from Chi Chi's restaurant, where he was employed. Erik was a rising senior at Douglas Byrd High School and worked at Chi Chi's from appropriately [sic] 6:00 pm until midnight. His body was discovered later that day, having been shot in the face with a shotgun. A witness testified at trial that he observed a black male drive Erik's car to the location where it was later recovered, get out of the vehicle and wipe off the steering wheel and door

handle. The black male identified, [sic] as Roderick Williams, was thereafter arrested and named [Robinson] as the person involved with him in the murder of Erik Tornblom.

[Robinson] was thereafter taken into custody and properly advised of his *Miranda* rights, which he waived. After initially denying any involvement in the murder, [Robinson] admitted that he and Williams had watched Erik Tornblom enter a store. While Tornblom was in the store, [Robinson] pulled out a sawed-off shotgun, which had been concealed in his clothes, and gave it to Williams. As the victim left the store, [Robinson] and Williams asked for a ride. As soon as they entered the car, Williams put the gun to the back of Erik Tornblom's neck and forced him to drive to a location that [Robinson] and Williams ordered. In his confession, [Robinson] stated that "[t]he boy kept begging and pleading for us not to hurt him, because he didn't have any money." After ordering [Tornblom] out of the car, he was made to lie down. According to [Robinson], Williams then shot [Tornblom] in the face with the shotgun. [Robinson] then took [Tornblom]'s wallet and split the money with Williams. [Robinson] led police to where he had hidden the shotgun and also showed them where the spent shotgun shell was ejected. Both the gun and the spent shell were recovered by the police.

Other evidence tended to show, two days prior to the murder, that [Robinson] told Williams' aunt that "he was going to burn him a whitey". [sic] On the morning of the murder, [Robinson] obtained the shotgun from a friend, who heard [Robinson] tell Williams that he wanted to rob a Quik Stop or "do" a white boy. After the murder, [Robinson] told a friend that he had robbed a guy the night before and shot him in the head.

(J.A. at 386-388.) At the time of these events, Robinson had just turned eighteen years old and only eleven days earlier had been released from prison.

Robinson and Williams were indicted by a North Carolina jury on August 5, 1991, and charged with one count of first-degree murder,

one count of first-degree kidnaping, one count of robbery with a dangerous weapon, once count of possession of a weapon of mass destruction, one count of felonious larceny, and one count of possession of a stolen vehicle. As Robinson admits,

> [at voir dire,] the prosecutor ensured that every member of the venire thoroughly revealed his or her religious preferences regarding . . . application of the death penalty. Moreover, each potential juror was required to unequivocally state that their religious beliefs would not interfere with their individual and collective duty to vote on the . . . sentencing phase[ ].

(J.A. at 438.)

Robinson's trial began on July 13, 1994. On the second day of trial, Robinson pleaded guilty to all of the offenses except for the first-degree murder charge. That charge was tried to the jury on two different theories: felony murder and murder with malice, deliberation, and premeditation (premeditated murder). The jury convicted Robinson, by special verdict, of first-degree murder under each theory.[1]

During the sentencing phase of the trial, the jury heard evidence relating to circumstances that both aggravated and mitigated the extent of Robinson's culpability in the crime. At the outset of its charge to the jury, the trial court emphasized to them that "[i]t is absolutely necessary that you understand and apply the law as I give it to you and not as you think it is or might like it to be." (J.A. at 213.) To guide the jury's consideration of the evidence presented, the trial court provided the jury with a form entitled "Issues and Recommendation as to Punishment," which consisted of a written list of two possible aggravating circumstances and twenty possible mitigating circumstances, and instructed the jury how to apply the law to each of these circumstances. (J.A. at 215-247.) The jury completed the form, finding both of the aggravating circumstances but only six of

---

[1]In a separate trial, a jury found Williams not guilty of premeditated murder but guilty of felony murder and robbery with a firearm. *State v. Williams*, 478 S.E.2d 782, 783 (N.C. 1996).

the mitigating circumstances.[2] The jury ultimately concluded that the aggravating circumstances outweighed the mitigating circumstances and unanimously recommended that Robinson be sentenced to death.[3]

Robinson's conviction and sentence were affirmed on direct appeal by a unanimous North Carolina Supreme Court. *State v. Robinson*, 463 S.E.2d 218 (N.C. 1995). The United States Supreme Court thereafter denied certiorari review. *Robinson v. North Carolina*, 517 U.S. 1197 (1996).

On November 1, 1996, Robinson filed his MAR. Following an evidentiary hearing on some of his claims,[4] the MAR court denied Robinson relief on all of his claims. The North Carolina Supreme Court denied discretionary review of the MAR court's ruling. *State v. Robinson*, 539 S.E.2d 646 (N.C. 1999).

On February 28, 2000, Robinson filed the instant § 2254 petition in the United States District Court for the Eastern District of North Carolina raising thirteen claims of constitutional error. The State moved for summary judgment on Robinson's petition, and on September 7, 2004, the district court denied Robinson's request for an evidentiary hearing and granted the State's motion for summary judgment. On February 28, 2005, the district court entered an order deny-

---

[2]Specifically, the jury found as aggravating circumstances that the murder was committed while Robinson was robbing Tornblom and that the murder was "especially heinous, atrocious or cruel." (J.A. at 249.) The jury found mitigating circumstances in Robinson's lack of criminal history, age, history of childhood abuse, childhood head injury, and behavioral or mental problems. The jury unanimously found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to warrant the death penalty.

[3]It appears that Robinson was never sentenced for the charges to which he pled guilty. *State v. Robinson*, 463 S.E.2d 218, 221 (N.C. 1995) ("Prayer for judgment was continued as to the charges to which defendant had pled guilty, and defendant was tried for first-degree murder.").

[4]As relevant to this appeal, the MAR court granted an evidentiary hearing on Robinson's Eighth Amendment claim, but denied a hearing on his Sixth Amendment claim.

ing Robinson a certificate of appealability on all of his claims. We granted Robinson's timely petition for a certificate of appealability on two issues: whether the MAR court erred in failing to grant him relief on (1) his claim that his death sentence violated the Eighth Amendment and (2) his claim that the presence of a Bible during jury deliberations violated the Sixth Amendment.

II.

We review de novo the district court's decision to deny a § 2254 petition based on the record before the MAR court, applying the same standards as the district court. *Whittlesey v. Conroy*, 301 F.3d 213, 216 (4th Cir. 2002). Pursuant to AEDPA, the scope of federal review is highly constrained. We may grant a petition with respect to any claim adjudicated on the merits in state court only if the state court decision was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C.A. § 2254(d)(1).

A decision of a state court is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court adjudication is an unreasonable application of federal law when the state court "correctly identifies the governing legal rule [from the Supreme Court's cases] but applies it unreasonably to the facts of a particular . . . case," *id.* at 407-08, or "applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable," *Green v. French*, 143 F.3d 865, 870 (4th Cir. 1998), *overruled on other grounds by (Terry) Williams*, 529 U.S. 362; *see also Oken v. Corcoran*, 220 F.3d 259, 263 n.3 (4th Cir. 2000) (noting that "the [Supreme Court in *(Terry) Williams* left] open the question of whether" *Green*'s definition of the "unreasonable application" was correct). The state court's application of clearly established federal law must be "objectively unreasonable," and "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *(Terry) Williams*, 529 U.S. at 411. The phrase "clearly established law" refers "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Robinson argues that the MAR court's decision on the Eighth and Sixth Amendment issues was an unreasonable application of clearly established law.[5] We examine these claims in turn.

### A.

Robinson's first argument is that his death sentence was imposed in violation of his Eighth Amendment right as established by *Enmund v. Florida*, 458 U.S. 782 (1982). In *Enmund*, the defendant was the getaway driver in a robbery that resulted in death. *Id.* at 784. Based solely on his participation in aiding and abetting the robbery, he was convicted of first-degree murder and sentenced to death. *Id.* at 785. The Supreme Court reversed his death sentence, holding that the Eighth Amendment prohibits imposing the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797.

Robinson contends that under the trial court's jury instructions, the jury was not required to find either that he killed or intended to kill Tornblom in order to convict him of first-degree murder and that, as a result, his death sentence violates *Enmund*. The MAR court rejected this argument on the merits, and we conclude that the MAR court's decision was not an unreasonable application of *Enmund*. In fact, the trial court's instructions required the jury to find both that Robinson killed Tornblom and that he intended his death to occur.

As noted, Robinson was tried on theories of premeditated murder and felony murder. Addressing premeditated murder first, the trial court charged that

---

[5]Robinson does not argue that the MAR court's decision was contrary to clearly established law.

the State must prove . . . that [Robinson] intentionally and with malice killed [Tornblom] with a deadly weapon . . . . that [Robinson's] act was a proximate cause of [Tornblom's] death . . . . that [Robinson] intended to kill [Tornblom] . . . . that [Robinson] acted after premeditation . . . . [and] that [Robinson] acted with deliberation.

(J.A. at 115.) This charge clearly required the jury to find that Robinson killed Tornblom and intended his death to occur in order to convict him for premeditated murder.

Robinson argues, however, that the trial court's felony murder charge, which followed, created an ambiguity in the premeditated murder charge. After setting forth the elements of felony murder,[6] the trial court gave the following instruction:

Ladies and gentlemen of the jury, for a person to be guilty of a crime, it is not necessary that he himself do all of the acts necessary to constitute the crime. If two or more persons act together with a common purpose to commit robbery with a firearm and are actually or constructively present at the time the crime is committed, each of them is held responsible for the acts of the others done in the commission of robbery with a firearm.

(J.A. at 118.) Robinson contends that this "acting-in-concert" instruction failed to differentiate between felony murder and premeditated murder such that he could have been convicted of the latter even if the jury believed that Williams killed Tornblom and that he (Robinson) lacked the requisite intent.

We disagree. The trial court's felony murder and premeditated murder charges were separate and distinct from one another, and the

---

[6]The trial court listed the elements of felony murder as follows: "First, that the defendant committed or attempted to commit robbery with a firearm . . . . Second, that while committing or attempting to commit robbery with a firearm the defendant killed the victim with a deadly weapon. And third, that the defendant's act was a proximate cause of the victim's death." (J.A. at 117-118.)

elements of each offense were clearly delineated. Moreover, by its own terms the acting-in-concert charge did not apply to the premeditated murder charge. Instead, by referring to the legal effect of the joint commission of a "robbery with a firearm," (J.A. at 118), the acting-in-concert charge was explicitly linked only to the felony murder theory.

If this were not enough, immediately after giving the acting-in-concert instruction, the trial court summarized the requirements for both theories of murder:

> So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date *the defendant intentionally killed the victim* with a deadly weapon and that this proximately caused the victim's death and that *the defendant intended to kill the victim* and that he acted with malice, after premeditation and with deliberation, *it would be your duty to return a verdict of guilty of first degree murder on the basis of malice, premeditation, and deliberation*.

> However, if you do not so find or have a reasonable doubt as to one or more of these things, you would not return a verdict of guilty of first degree murder on the basis of malice, premeditation, and deliberation.

> Whether or not you find the defendant guilty of first degree murder on the basis of malice, premeditation, and deliberation, you will also consider whether he is guilty of first degree murder under the first degree felony murder rule.

> So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant, acting either by himself or acting together with Roderick Williams, had in his possession a firearm and took and carried away property from the person or presence of a person without his voluntary consent by endangering or threatening another person's life with the use or threatened use of a firearm, the defendant knowing that he was not entitled to

take the property and intending to deprive him of its use permanently and while committing or attempting to commit robbery with a firearm the defendant killed the victim and the defendant's act was a proximate cause of the victim's death, it would be your duty to return a verdict of guilty of first degree murder under the felony murder rule.

(J.A. at 119-120 (emphases added).)

In this summation, the court reaffirmed that the acting-in-concert instruction applied *only* to felony murder by charging that Robinson could be found guilty of premeditated murder only if Robinson "killed" and "intended to kill" Tornblom. (J.A. at 119.) Moreover, by charging in the summation that the jury could convict Robinson of felony murder if it found that he "act[ed] either by himself or act[ed] together with [Williams]" to commit robbery with a firearm, the trial court again expressly linked and limited the acting-in-concert instruction to the felony murder charge. (J.A. at 119.) The summation reaffirmed that the jury could find Robinson guilty of premeditated murder only if it found that he killed Tornblom and intended his death to occur. Because the trial court's instruction required the jury to make these findings, the MAR court did not unreasonably apply *Enmund* in denying Robinson's Eighth Amendment claim.[7]

### B.

### 1.

Robinson's second argument is based on two subparts: (1) that his

_____

[7]We also note the stark differences between this case and *Enmund v. Florida*, 458 U.S. 782 (1982). In *Enmund*, the "record supported no more than the inference that Enmund was . . . in the car by the side of the road at the time of the killings, waiting to help the robbers escape." *Id.* at 788. Such facts are a far cry from this case, where the evidence showed that Robinson was the instigator of a kidnaping and robbery perpetrated at gunpoint, told others of his intent to "burn" a "white boy," and the following day bragged of killing Tornblom. To equate Robinson with Enmund, a getaway driver following a robbery that resulted in murder, is specious.

death sentence was imposed in violation of his Sixth Amendment right of confrontation because the Bible amounted to evidence against him and (2) that his death sentence was imposed in violation of his Sixth Amendment right to impartial sentencing deliberations because the Bible reading was an improper influence upon the jury. To support these contentions in the MAR court, Robinson presented the affidavits of two law students that summarized their conversations with two of the jurors in the case. Those affidavits state:

> The [first] juror revealed that [a second] juror had asked for a bailiff to bring in a bible during deliberation on sentencing. He recalled that the bailiff provided a bible, and the second juror read a passage concerning an "eye for an eye." The one who requested the bible was citing to the scripture passage to attempt to convince other jurors, including the one we interviewed . . . that they should change their position from one favoring a life sentence to one favoring a death sentence. The bible passage was read to the other jurors before the final vote for a death sentence . . . .

> [A third] juror corroborated the first juror's statement, and confirmed the fact that the [second] juror had a bible during deliberations on sentencing, however the third juror could not recall whether the bailiff provided the bible, or whether the [second] juror had brought it into the deliberations. The third juror. . . remembered the [second] juror quoting scriptures during sentencing, but did not remember the specific passage quoted.

(J.A. at 283-84.)

Robinson also argued that he could produce four jurors who were willing to testify to these facts at an evidentiary hearing. The MAR court denied the Bible claim without an evidentiary hearing, stating that "there is insufficient evidence to require an evidentiary hearing on the issue, even taking the submitted materials in the light most favorable to [Robinson]." (J.A. at 428.) The MAR court held "that the alleged Bible reading, if it occurred, [was] not extraneous, prejudicial information" as required under North Carolina law to permit the

impeachment of a jury verdict. (J.A. at 428 (internal quotation marks omitted).)

Robinson conceded in his habeas petition that "the [MAR] court denied [his Sixth Amendment] claim on the merits," (J.A. at 437), and he does not now argue otherwise. We therefore subject this claim, as we did his Eighth Amendment claim, to AEDPA's deferential standard of review. *See Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (en banc) (holding that a state court decision denying petitioner post-conviction relief "[on] the merits . . . must be reviewed under the deferential provisions of § 2254(d)(1)"). To satisfy this standard, AEDPA "does not require citation of [Supreme Court] cases — indeed, it does not even require *awareness* of [those] cases." *Early v. Packer*, 537 U.S. 3, 8 (2000) (emphasis in original). "In assessing the reasonableness of the state court's application of federal law, [therefore,] the federal courts are to review the *result* that the state court reached, not 'whether [its decision] [was] well reasoned.'" *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (quoting *Bell*, 236 F.3d at 159; *Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998); and *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997))(alterations in original and emphasis added).

In examining the merits of Robinson's claim, we, like the MAR court, will assume the factual allegations set forth in the law students' affidavits are true. *See Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (assuming on federal review the truth and admissibility of petitioners factual allegations where the MAR court denied an evidentiary hearing on the claim). These affidavits allege the following: (1) a juror asked for, and the bailiff provided, a Bible during sentencing deliberations; (2) the juror read an "eye for an eye" passage;[8] (3) the passage was read to the other jurors before a final vote on a death sen-

---

[8]Robinson does not allege which "eye for an eye" passage was read. The King James Version of the Bible provides several references to "eye for an eye." The Old Testament contains three such passages: (1) "Eye for eye, tooth for tooth, hand for hand, foot for foot," Exodus 21:24; (2) "Breach for breach, eye for eye, tooth for tooth: as he hath caused a blemish in a man, so shall it be done to him again," Leviticus 24:20; (3) "And thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot," Deuteronomy 19:21. But in the New Testament's Sermon on the Mount, Jesus said, "Ye have heard that it hath been said, An eye for an eye, and a tooth for a tooth: But I say unto you, that ye resist not evil: but whosoever shall smite thee on thy right cheek, turn to him the other also." Matthew 5:38-39. We assume, for the sake of argument, that the juror read from the Old Testament.

tence; and (4) the juror read the passage in an attempt to convince his fellow jurors to vote for a death sentence.

The Sixth Amendment provides, in relevant part, that "the accused shall enjoy the right to a . . . trial[ ] by an impartial jury . . . [and to] be confronted with the witnesses against him." U.S. Const. amend VI. The right to trial by an impartial jury "guarantees . . . a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). This right prohibits "any private communication, contact, or tampering directly or indirectly, with a juror during trial about the matter pending before the jury." *Remmer v. United States*, 347 U.S. 227, 229 (1954). The right of confrontation requires that the "jury's verdict must be based upon the evidence developed at the trial." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). In addition, it "necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]." *Id.* at 472 (internal quotation marks omitted). These rights apply equally to sentencing proceedings tried to a jury. *See Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992).

Despite these venerable protections afforded to criminal defendants, the Sixth Amendment does not require that all evidence introduced by the defendant tending to impeach the jury's verdict be considered by the courts. *See Tanner v. United States*, 483 U.S. 107, 117 (1987). In fact, the common-law rule generally "prohibited the admission of juror testimony to impeach a jury verdict." *Id.* at 117. The Supreme Court explained the justification for this rule in *McDonald v. Pless*, 238 U.S. 264 (1915), decided early last century:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be

a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*Id.* at 267-68.[9] This common-law rule has been codified in Fed. R. Evid. 606(b) and in many states' rules of evidence, including North Carolina's.[10]

---

[9]*McDonald v. Pless*, 238 U.S. 264 (1915) was a civil case, but the Supreme Court has cited its reasoning with approval in the criminal context. *See Tanner v. United States*, 483 U.S. 107, 117 (1987).

[10]Federal Rule of Evidence 606(b) provides:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

North Carolina Rule of Evidence 606(b) is identical to its federal counterpart. *See* N.C. Gen. Stat. § 8C-1, Rule 606(b) (2003). North Carolina law also provides:

(a) Upon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined. . . .

(c) After the jury has dispersed, the testimony of a juror may be received to impeach the verdict of the jury on which he served, subject to the limitations in subsection (a), only when it concerns:

(1) Matters not in evidence which came to the attention of one or more jurors under circumstances which would violate

Like the common law, the Federal Rules of Evidence and the North Carolina Rules of Evidence contain an exception to this general rule when "extraneous prejudicial information" is improperly brought to the jury's attention or when an "outside influence [is] improperly brought to bear upon any juror." Fed. R. Evid. 606(b); N.C. Gen. Stat. § 8C-1, Rule 606(b) (2003); *see also Tanner*, 483 U.S. at 117 (describing exceptions to the common-law rule excluding juror testimony).[11]

These exceptions track the Sixth Amendment protections embodied in the Confrontation and Impartial Jury Clauses. First, the exception for extraneous prejudicial information allows the court to consider juror allegations that the defendant's rights to confrontation were violated. In *Parker v. Gladden*, 385 U.S. 363 (1966), for example, the defense attorney, after speaking with jurors, prepared an affidavit alleging that

> a court bailiff assigned to shepherd the sequestered jury, which sat for eight days, stated to one of the jurors in the presence of others while the jury was out walking on a public sidewalk: "Oh that wicked fellow [petitioner], he is guilty"; and on another occasion said to another juror under similar circumstances, "If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it."

---

the defendant's constitutional right to confront the witnesses against him; or

(2) Bribery, intimidation, or attempted bribery or intimidation of a juror.

N.C. Gen. Stat. § 15A-1240 (2003).

[11]Even under these exceptions, however, no juror may testify to the effect of either the information or an influence on the jury's deliberative process, but only that the information or influence came before the jury. *See Mattox v. United States*, 146 U.S. 140, 149 (1892)("[A] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence although not as to how far that influence operated upon his mind."); N.C. Gen. Stat. § 15A-1240(a).

385 U.S. at 363-64. Despite the fact the affidavit was based on juror's testimony, the Supreme Court did not discuss whether the affidavit was admissible. Instead, it simply accepted the evidence and concluded that the bailiff's statements were tantamount to testimonial evidence, and, because they were not made on the witness stand at trial, the defendant was denied his constitutional right of confrontation. *Id.* at 364 ("We have followed the undeviating rule that the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial." (internal quotation marks and citations omitted)).

Similarly, in *Turner v. Louisiana*, 379 U.S. 466 (1965), two deputy sheriffs who were key prosecution witnesses were also responsible for the sequestration of the jury during the defendant's trial. *Id.* at 467-468. These deputies "ate with [the jury], conversed with them, and did errands for them." *Id.* at 468. Without discussing the source of the evidence used to impeach the jury's verdict, the Court declared that the Sixth Amendment's right to a jury trial "necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]." *Id.* at 472-73 (internal quotation marks omitted). The deputy sheriffs' association with the jury risked that the jurors would make their determinations about the deputy sheriffs' trustworthiness outside of the courtroom, thus eliminating Turner's ability to cross-examine the deputy sheriffs effectively and tainting the jury's ability to weigh the evidence neutrally. *Id.* at 473. The Court concluded that "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." *Id.* at 473.

The exception to the exclusionary rule for outside influences, on the other hand, protects a defendant's right to an impartial jury. In *Remmer v. United States*, 347 U.S. 227 (1954), for example, an unnamed person attempted to bribe a juror. *Id.* at 228. Before the jury returned a verdict, the juror reported the incident to the judge, who informed the prosecutor, and the FBI was called in to investigate. *Id.* The defendant, however, was not informed of the incident until after the trial. *Id.* The Supreme Court concluded that a hearing was required to determine whether the bribe and the FBI's investigation

involved "private communication, contact, or tampering . . . with a juror," thereby exerting an outside influence on the jury's verdict, despite the fact the hearing would inevitably require the jurors to testify as to their exposure to the bribe or the FBI's investigation. *Id.* at 229-230.[12]

In contrast to *Parker*, *Turner*, and *Remmer*, which involved *external* influences upon a jury,[13] is the line of Supreme Court cases involving an *internal* influence.[14] In *Tanner v. United States*, 483 U.S.

---

[12]Robinson argues that *Burch v. Corcoran*, 273 F.3d 577 (4th Cir. 2001) compels us to grant him relief on his improper-influence claim. In *Burch*, we held, outside of AEDPA's strictures, that a juror's Bible reading during sentencing deliberations was not, without more, an improper influence on the jury. *Id.* at 591. We question whether this holding could assist Robinson even on de novo review, but it assuredly provides no support for Robinson's argument that the MAR court unreasonably applied clearly established federal law as determined by the Supreme Court.

[13]We use the term "external influence" as shorthand to refer to both extraneous prejudicial information and outside influences.

[14]Our good dissenting colleague argues that we "artificially split[ ]" *Parker v. Gladden*, 385 U.S. 363 (1966), *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Remmer v. United States*, 347 U.S. 227 (1954), into two categories: cases that involved extraneous prejudicial information (*Parker* and *Turner*) and cases that involved an outside influence (*Remmer*). *Post* at 31. He seems to believe that each of these cases involved an outside influence and nothing more. As our discussion in the text clearly reveals, however, *Parker* and *Turner* each involved the exposure of the jury to extraneous prejudicial information. In *Parker* the information was that the defendant was "wicked" and "guilty," 385 U.S. at 363, and in *Turner* the information was knowledge about the deputy sheriffs' credibility gained while they were shepherding the jury. 379 U.S. at 472-73. The dissent's argument, moreover, is baffling given that our dissenting colleague acknowledges that in *Parker*, "the [Supreme] Court referenced [the] right to confrontation." *Post* at 32. Such a reference would have been useless had that right not been implicated in the case.

While we conclude that *Parker* and *Turner* each involved extraneous prejudicial information, we do not conclude, as the dissent seems to believe, that *Parker* and *Turner* each involved *only* extraneous prejudicial information. Our discussion in the text merely recognizes that *Par-*

107 (1987), for example, the defendant sought an evidentiary hearing at which he proposed to examine jurors' alleged drug and alcohol use during the trial. *Id.* at 117. The Supreme Court refused to grant the defendant relief because, unlike *Parker*, *Turner*, and *Remmer*, a hearing would allow inquiry "into the internal processes of the jury." *Id.* at 120. Although the Supreme Court has never provided a formula for deciding whether a particular influence upon the jury was external or internal, it did cite approvingly to lower courts holding that the distinction turns not on whether the influence occurs inside or outside the jury room but is rather "based on the nature of the [influence]." *Id.* at 117. In *Tanner*, the Supreme Court disagreed with the defendant's argument that the Sixth Amendment compelled the district court to consider evidence of jurors' intoxication, holding instead that

---

*ker* and *Turner* are illustrative of the extraneous prejudicial information exception to the common-law rule of exclusion, but we nowhere conclude that *Parker* and *Turner* do not also involve outside influences. Moreover, in protesting our description of *Parker* and *Turner*, the dissent fails to recognize that Robinson's Bible claim implicates two separate and distinct Sixth Amendment protections: the right to an impartial jury (*i.e.*, a jury free of external influence) *and* the right to confront the witnesses against him (*i.e.*, a jury not presented with extraneous prejudicial information).

In any event, the dissent claims that by failing to discuss the outside influence elements of *Parker* and *Turner*, we "obscure[ ] the clear principle that emerges from [those cases]." *Post* at 31. Short of that simple assertion, however, the dissent fails to demonstrate that the outside-influence elements of *Parker* and *Turner* would alter our analysis in any way. As both we and the dissent agree, *Parker* and *Turner* contain respective holdings that the bailiff's *communications* with jurors were an outside influence, as was the deputy sheriffs' *contact* with jurors. *Post* at 32-34. We fail to see how these holdings add materially to *Remmer*'s formulation of the outside-influence exception: the Sixth Amendment prohibits "private *communication*, *contact*, or tampering . . . with a juror." 347 U.S. at 229. Because *Remmer*'s rule encompasses the outside-influence rule that *Parker* and *Turner* stand for, to analyze *Remmer* is impliedly to analyze *Parker* and *Turner*. Any other conclusion derives from an incomplete understanding of *Remmer*. The dissent's charge that we obscure the meaning of *Parker*, *Turner*, and *Remmer* is, therefore, itself nothing more than smoke and mirrors.

other aspects of the trial process protect the defendant's right to a jury free of internal influences upon the jury:

> The suitability of an individual for the responsibility of jury service, of course, is examined during voir dire. Moreover, during trial the jury is observable by the court, by counsel, and by court personnel. Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict.

*Id.* at 127 (internal citations omitted and emphasis in original).

*Tanner* thus establishes that the Sixth Amendment's guarantees do not require judicial consideration of juror allegations regarding influences internal to the deliberation process. Under clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case,[15] *see Parker*, 385 U.S. at 364; *Turner*, 379 U.S. at 473, or (2) is an outside influence upon the partiality of the jury, such as "private communication, contact, or tampering . . . with a juror," *Remmer*, 347 U.S. at 229. Robinson has cited, and our research has unearthed, no Supreme Court case addressing whether allegations of Bible reading fall into either of these categories.

---

[15]The dissent suggests that the category of extraneous prejudicial information need not "bear on a fact at issue in the case" to violate the Confrontation Clause. *Post* at 33 n.4. Although we do not have occasion to define with any precision what the word "prejudicial" means in this context, it must mean at least that the information bears on a fact at issue in the case. Under any other view, the list of ingredients on the packs of coffee provided for jurors would violate the Confrontation Clause because it is "extraneous" to the evidence presented in the case and because it is "information." Such a boundless interpretation of the Confrontation Clause cannot be correct.

Moreover, although the dissent references one statement by the bailiff in *Parker*, *post* at 33 n.4, that did not bear on a fact at issue, it ignores the bailiff's second statement — that the defendant was guilty — that plainly *did* bear on a fact at issue.

Although our answer could possibly be different on de novo review, we are satisfied that the MAR court did not unreasonably apply these principles in denying Robinson's Bible-reading claim. First, contrary to Robinson's suggestion and unlike the bailiff's statements in *Parker* and deputy sheriffs' association with the jury in *Turner*, it would have been reasonable for the MAR court to conclude that the Bible had no bearing on any *fact* relevant to sentencing, and was therefore not tantamount to "evidence" that was used against him at sentencing. *See Black's Law Dictionary* 595 (8th ed. 2004) (defining "evidence" as "something . . . that tends to prove or disprove the existence of an alleged fact"). In the end, the jury concluded that the balance of the aggravating and mitigating circumstances warranted imposing the death penalty. Unlike the facts at issue in *Parker* and *Turner*, no Biblical passage — including the ones we assume were read — had any evidentiary relevance to the jury's determination of the existence of these aggravating and mitigating circumstances.[16]

Second, it would have been reasonable for the MAR court to conclude that the Bible is not analogous to a private communication, contact, or tampering with a juror, and that the common-law rule against allowing juror testimony applied. *See Remmer*, 347 U.S. at 229. Unlike these occurrences, which impose pressure upon a juror apart from the juror himself, the reading of Bible passages invites the listener to examine his or her own conscience from within. In this way, the Bible is not an "external" influence. In addition, reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence. *Cf. Tanner*, 483 U.S. at 124 (in holding that Fed. R. Evid. 606(b) does not violate the Sixth Amendment, noting that the Rule does not "open[ ] verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleges that the jury refused to follow the trial judge's instructions or that some of the jurors did not take part in deliberations"

---

[16]We note that the Ninth Circuit recently reached a similar conclusion that the Bible is not "extrinsic, factual material" to a jury. *See Fields v. Brown*, 431 F.3d 1186, 1208-09 (9th Cir. 2005). In *Fields*, the jury also had considered an "eye for an eye" passage, among others. *Id.* The Ninth Circuit concluded that these "Bible verses . . . [were] not, in fact, facts at all." *Id.* at 1209.

(quoting S.Rep. No 93-1277, p. 13-14 (1974))); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 149 (O'Connor, J., concurring) ("Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them." (internal quotation marks omitted)). We do not believe that the physical presence and reading of the Bible in the jury room required the MAR court to arrive at a different conclusion under clearly established Supreme Court case law. Moreover, like the alleged misconduct in *Tanner*, we believe that the MAR court reasonably could have concluded that the safeguards of the trial process — in particular, the facts that jurors' religious views can be examined at voir dire, as they were in this case, and that the defendant can request a jury charge explaining to the jurors their duty to follow the law, as was given in this case — provide an adequate protection of a defendant's right to be sentenced by a jury free of improper influences such that a post-verdict examination into Bible reading is unnecessary.

To be sure, the line between an "external" influence and an "internal" influence is a fine one, and one that may even blur upon close inspection. In a formalistic sense, the Bible itself is "external" to jurors, as is a private communication, contact, or tampering insofar as it is not a document physically within the jurors themselves. But then so too were the drugs and alcohol allegedly ingested in *Tanner* "external" in this sense of the word. In any event, formalistic analyses conflict with *Tanner*'s admonition that whether an influence is external or internal is not determined by rigid concepts, but by analyzing the "nature" of the influence. 483 U.S. at 117. The difficulty in locating the line between *Remmer* and *Tanner* only confirms that the MAR court's rejection of Robinson's Bible claim was not an unreasonable application of clearly established law. *See Mitchell v. Esparza*, 124 S.Ct. 7, 11 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous.").

The dissent believes that jurors can generally impeach their verdict by testifying about any influence that had the "serious potential of *swaying* the jury towards a sentence of death," *Post* at 28 (emphasis added), with the single exception that jurors cannot testify to their own physical or mental impairments because those influences only

"*impair*[ ] the juror's . . . ability to function effectively." *Post* at 35.[17] According to at least a century of Supreme Court jurisprudence, the dissent has it backwards. As we have discussed, the "firmly established" *general* rule is that juror testimony *may not* be used to impeach a jury verdict. *Tanner*, 483 U.S. at 117. The only exception to this rule is for external influence, as we have identified in *Parker*, *Turner*, and *Remmer*. But lest this exception be viewed as swallowing the rule, the *Tanner* Court reiterated that the general rule applies to situations that do not fit within the exception for external influence as identified by those cases. *Tanner*, 483 U.S. at 117 ("In situations that did not fall into this exception for external influence, however, the Court adhered to the common-law rule against admitting juror testimony to impeach a verdict.").

The dissent characterizes *Tanner* as only "concern[ing] a phenomenon . . . [of] influences that impair a juror's mental or physical capacity." *Post* at 31. Such is not the case. While *Tanner* is certainly focused on mental and physical impairment, its focus is narrowly circumscribed only because those were the facts presented to the Court. The legal rule of *Tanner*, however, is not so limited. By characterizing *Tanner* as related only to physical or mental impairments, the dissent conflates the rule with the rule's application.

The facts of *McDonald*, 238 U.S. at 264, and *Hyde v. United States*, 225 U.S. 347 (1912) — cases that *Tanner* cites approvingly as stating the general rule — illustrate this point. In *McDonald*, it was

---

[17]Our dissenting colleague sees the need to posit his own definition of an internal influence because he argues that ours — influences internal to the deliberation process — is "vague and circular" and "finds no support in *Tanner*." *Post* at 34. The careful reader will observe, however, that our definition is but a rephrasing of the definition given by the Court in *Tanner* itself. 483 U.S. at 120 (noting that by seeking to introduce evidence from jurors that other jurors were intoxicated, the defendant sought an inquiry "into the internal processes of the jury"). Any vagueness or circularity that exists in the definition provided by the Court in *Tanner* demonstrates that the line between external and internal influences is anything but clearly established. To be sure, the dissent's rule has the advantage of clarity over the one adopted by the Supreme Court in *Tanner*. AEDPA's "clearly established" standard requires, however, that the rule be clearly established by the Supreme Court, not this court.

alleged that the jury neglected its duty to determine damages and instead used an improper quotient method, in which the damages were determined by adding each juror's individual damage estimate and dividing by the total number of jurors. 238 U.S. at 265-66. Despite the obvious prejudice to the defendant, the Supreme Court did not allow the jury to impeach its own verdict. *Id.* at 269. In *Hyde*, the defendant alleged that the jury did not decide his guilt or innocence but instead had made a bargain among themselves to convict him in exchange for acquitting his fellow defendant. 225 U.S. at 347, 381-82. Even assuming the facts Hyde alleged were true, the Supreme Court agreed that there should be no inquiry into them because they involved "matters which essentially inhere in the verdict itself and necessarily depend upon the testimony of the jurors, and can receive no corroboration." 225 U.S. at 384. In these two cases, the jury's actions were clearly improper; yet the Court did not allow —- much less require —- an inquiry into whether the defendant had been prejudiced. The dissent's purported rule that an "external influence" is one that substantially sways the jurors against the defendant collapses in view of these cases: surely nothing can be more biased against a defendant than a jury in dereliction of its duty to decide his guilt or innocence.

Furthermore, not only does the dissent's rule have no basis in Supreme Court precedent, it also ignores *Tanner*'s warning that the "integrity of jury proceedings" is jeopardized by inquiries "into the internal processes of the jury." 483 U.S. at 120. Under the dissent's definition of "external influence," the Sixth Amendment violation does not arise simply by virtue of the Bible's presence in the jury room alone; according to the dissent's own formulation, the violation arises because the jury may have been swayed by "a divine command to condemn a defendant to death," *Post* at 37. On the dissent's view, in other words, the problem must arise from the jurors' hearing and obeying the divine commands. Following this logic, the dissent would allow Robinson a hearing even if the juror had *merely recited from memory* the "eye for an eye" passage during deliberations because this memorized recitation of divine commands "carries the serious potential of swaying the jury towards a sentence of death."[18] *Post* at 28. As

---

[18]For many jurors — including those who are not followers of the Judeo-Christian faith — the "eye for an eye" passage is a "cultural precept." *See Burch*, 273 F.3d at 591 (internal quotation marks omitted). We cannot expect jurors to leave these precepts at the courthouse door.

discussed, however, such an inquiry is clearly prohibited. The fact that the bailiff provided the Bible to the juror does not alter our conclusion that it was not an external influence. Robinson does not allege that the bailiff instructed the jury to consult the Bible, or, for that matter, that he did anything other than simply provide the Bible upon the juror's request. On these facts, the MAR court reasonably could have concluded that the bailiff's act of providing a Bible was nothing more than an innocuous intervention into the jury's deliberations. *Cf. Howard v. Moore*, 131 F.3d 399, 422 (4th Cir. 1997) (concluding that giving jurors scrap paper consisting of a prosecutor's unused form letters thanking former jurors for their service was nothing more than an "innocuous intervention[ ]" (internal quotation marks omitted)). Indeed, it is reasonable to expect that a juror who wants something during deliberations — whether it is aspirin, a pen, or a Bible — will ask the bailiff to obtain it for him. The MAR court reasonably could have concluded that the bailiff's actions in fulfilling the juror's request did not, without more, turn the Bible into an external influence.

Finally, in a statement that was obviously designed to excite the passions to a greater degree than the intellect, the dissent argues that our analysis "should be offensive to those who consider the Bible sacred" because we conclude "that a divine command to condemn a defendant to death carries less potential to influence a juror" than would a private communication, contact, or tampering. *Post* at 37. Surely the dissent, which does not cite a single sentence from our opinion in support of this outlandish claim, must recognize that our analysis is not based on a belief that the Bible has no ability to sway a juror, but on a belief that *precisely because* the Bible occupies a unique place in the moral lives of those who believe in it, its teachings cannot blithely be lumped together with a private communication, contact, or tampering with a juror without clear guidance from the Supreme Court. With all respect to our dissenting colleague, to argue that our analysis says anything more is simply misleading.

For the reasons discussed above, Robinson "has failed to show that the MAR court's decision was . . . an unreasonable application of[ ] clearly established Supreme Court precedent, because the decisions on which he relies . . . are each distinguishable." *Conner v. Polk*, 407 F.3d 198, 208 (4th Cir. 2005). Therefore, Robinson is not entitled to habeas relief on his Sixth Amendment claim.

2.

Robinson asks us to remand for an evidentiary hearing on his Sixth Amendment claim. The State argues that Robinson may not receive an evidentiary hearing because his MAR failed to comply with North Carolina's procedural law. We review the district court's denial of an evidentiary hearing for abuse of discretion. *See Walker v. True*, 401 F.3d 574, 581 (4th Cir. 2005).

A § 2254 petitioner may not receive an evidentiary hearing in the district court if he "'failed to develop the factual basis of a claim in state court'" unless he shows the existence of several statutory factors not relevant here.[19] *See Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002) (quoting 28 U.S.C.A. § 2254(e)(2)). "A failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault attributable to the [petitioner] or the [petitioner's] counsel." *(Michael) Williams v. Taylor*, 529 U.S. 420, 432 (2000). The State argues that North Carolina law requires that a MAR be accompanied by admissible evidence and that, by presenting only hearsay affidavits to the MAR court despite the fact he could have obtained affidavits directly from the jurors themselves, Robinson was not diligent in pursuing his Sixth Amendment claim in the MAR court.

We agree with the State that a petitioner who fails to comply with state law in seeking an evidentiary hearing can be held to lack diligence in pursuing his claim. *Id.* at 437 ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."); *see also Smith v. Bowersox*, 311 F.3d 915, 921 (8th Cir. 2002) ("[The petitioner's] failure to comply with Missouri law reflects a lack of diligence."). It is unclear, however, that Robinson failed to comply with state law by submitting hearsay affidavits in support of his MAR. To

---

[19]The statutory factors are: (1) the claim relies on (a) a new rule of constitutional law made retroactive to cases on collateral review, or (b) facts that previously could not have been discovered, and (2) that the facts establish a "convincing claim of innocence." *(Michael) Williams v. Taylor*, 529 U.S. 420, 435 (2000); *see also* 28 U.S.C.A. § 2254(e)(2) (listing statutory factors).

be sure, the law students' affidavits are brimming with hearsay, and North Carolina law provides that they would be inadmissible at an evidentiary hearing in the MAR court. *State v. Adcock*, 310 S.E.2d 587, 608 (N.C. 1983). But whether inadmissible evidence can be used *at an evidentiary hearing* is a different question from whether inadmissible evidence can support a claim for *entitlement to an evidentiary hearing*. The State has not cited, and we have not found, a single North Carolina decision squarely holding that the MAR must be accompanied by admissible evidence in order for the petitioner to demonstrate entitlement to an evidentiary hearing. Furthermore, the MAR court did not find that Robinson failed to comply with North Carolina law by failing to submit admissible evidence. *Cf. Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (denying a federal evidentiary hearing to a petitioner because the state habeas court had concluded that the petitioner failed to properly develop the evidentiary basis of his claim). Because it is not clear that North Carolina rules require a MAR to be accompanied by admissible evidence and because the MAR court did not make such an evidentiary ruling, we cannot hold that Robinson's failure to submit admissible evidence demonstrates a lack of diligence before the MAR court. *Cf. Bacon*, 225 F.3d at 477 ("[I]t is not our role . . . to review the correctness of the state MAR court's application of its state-law procedural rules . . . .").

The fact that Robinson is not barred from receiving an evidentiary hearing in the district court, however, does not mean that he is automatically entitled to one. *See Fullwood*, 290 F.3d at 681. Instead, a district court may grant an evidentiary hearing in a § 2254 case only where the petitioner has "allege[d] additional facts that, if true, would entitle him to relief" and has "establish[ed] one of the six factors set forth in *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)."[20] *Fullwood*, 290 F.3d at 681 (internal quotation marks

---

[20]The six *Townsend* factors are as follows:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discov-

omitted). Robinson's § 2254 petition, however, alleged the *same* facts that had been alleged before the MAR court. Because we conclude that the MAR court did not unreasonably apply clearly established federal law to those facts, Robinson has not alleged any "additional facts that, if true, would entitle him to relief," and we therefore need not consider whether any of the *Townsend* factors have been met. *Cardwell v. Green*, 152 F.3d 331, 338 (4th Cir. 1998) (denying an evidentiary hearing where the petitioner "failed to forecast any evidence beyond that already contained in the record, or otherwise to explain how his claim would be advanced by an evidentiary hearing" (internal quotation marks omitted)), *overruled on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000); *Bennett v. Angelone*, 92 F.3d 1336, 1347 (4th Cir. 1996) (holding, pre-AEDPA, that petitioner's claim for an evidentiary hearing failed because he "add[ed] nothing 'additional' to the factual mix already before the district court"). The district court therefore did not abuse its discretion in denying Robinson an evidentiary hearing.

### III.

Accordingly, we affirm the district court's decision denying Robinson's § 2254 petition and denying him an evidentiary hearing.

*AFFIRMED*

KING, Circuit Judge, dissenting in part:

This appeal presents an important Sixth Amendment issue, and I write separately because it is being wrongly decided. The Sixth Amendment entitles an accused to the sacrosanct right of a fair trial before an impartial jury, a mandate that "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial

---

ered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Fullwood*, 290 F.3d at 681 n.7 (internal quotation marks omitted).

by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). And when a jury's deliberations have been contaminated by an improper external influence — even if that influence relates to the Bible of England's first Stuart King — public confidence in our judicial system is undermined and the jury's verdict must not be enforced.

By its opinion today, the panel majority erroneously concludes that Robinson is not even entitled to an evidentiary hearing on the improper influence issue, because the state court's ruling thereon was not an unreasonable application of clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). The majority reaches its conclusion, however, through its own misapplication of the relevant Supreme Court precedents, which obscures the unmistakably clear line that divides those decisions. The decisions distinguished by the majority — *Parker v. Gladden*, 385 U.S. 363 (1966), *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Remmer v. United States*, 347 U.S. 227 (1954) — involved a single phenomenon: an *external* influence upon a juror that carries the potential to sway him against the defendant. On the other hand, the decision on which the majority primarily relies — *Tanner v. United States*, 483 U.S. 107 (1987) — relates only to an *internal* influence that impairs a juror's physical or mental ability to properly function.

The facts here — that the court bailiff provided a Bible to a deliberating juror, who then read aloud to his fellow deliberating jurors a passage concerning the Biblical mandate of "an eye for an eye" — plainly concern an *external* influence, i.e., one which carries the serious potential of swaying the jury towards a sentence of death. A contrary decision (deeming such conduct to be an *internal* influence only) demeans the Bible and those who believe in it, and constitutes "an unreasonable application of[ ] clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Robinson's allegations thus satisfy the requirements of § 2254(d)(1), and he is entitled to an evidentiary hearing to prove them. First, an *external* influence that has the potential to sway a juror against the defendant must be deemed presumptively prejudicial. Robinson has thus "allege[d] facts which, if proved, would entitle him to relief." *Townsend v. Sain*, 372 U.S. 293, 312 (1963). Next, because the state court did not find facts regarding the improper influence

issue, Robinson has plainly satisfied the *Townsend* factor that "the material facts were not adequately developed at the state-court hearing." *Id.* at 313. Finally, the district court committed an error of law in ruling that the law students' affidavits were insufficient to warrant an evidentiary hearing, and it thus abused its discretion in that respect.

I would grant Robinson an evidentiary hearing on the improper influence issue, and I write separately to dissent on that aspect of this appeal.[1]

I.

Robinson's factual allegations concerning the Bible provided to the jurors (the "Bible claim") are contained in the law students' affidavits, which were presented to the state court and made a part of Robinson's habeas corpus petition. According to the affidavits — which we must accept as true — a juror requested a Bible from the bailiff during the jury's deliberations on whether Robinson should be accorded the death penalty. Upon receiving this unusual request, the bailiff provided a Bible to the juror, without either the approval or notification of the court. The juror then proceeded to read aloud to other jurors a passage concerning the Biblical mandate of "an eye for an eye," in an effort to convince the jury to recommend a death sentence. Ultimately, the jury recommended that Robinson be sentenced to death.

On January 4, 1999, the state court which ruled on Robinson's motion for appropriate relief (the "MAR court") concluded that the foregoing allegations were insufficient to warrant an evidentiary hearing because, even assuming their truth, the provision and use of the Bible did not constitute "extraneous, prejudicial information" before the jury. After the Supreme Court of North Carolina denied discretionary review of the MAR court's ruling, Robinson filed a § 2254 petition in the Eastern District of North Carolina asserting, inter alia, the Bible claim. As relevant here, the district court denied Robinson's request for an evidentiary hearing on the Bible claim, deeming the law students' affidavits insufficient to warrant such a hearing. We

---

[1]I concur in Part I of the panel majority's opinion, which sets forth the general facts underlying this appeal, and in Part II.A, the disposition of Robinson's *Enmund* claim.

thereafter granted Robinson a certificate of appealability on the Bible
claim.

The question before us today is whether Robinson is entitled to an
evidentiary hearing on the Bible claim. As the panel majority cor-
rectly observes, because Robinson was diligent in pursuing the Bible
claim in state court, § 2254(e)(2) does not govern our analysis.
Instead, Robinson must satisfy the requirements set forth in *Townsend
v. Sain*, 372 U.S. 293 (1963). Under *Townsend*, Robinson must first
"allege[ ] facts which, if proved, would entitle him to relief." *Id.* at
312. This mandate requires Robinson to demonstrate that the MAR
court's ruling "was contrary to, or involved an unreasonable applica-
tion of, clearly established Federal law, as determined by the Supreme
Court of the United States," 28 U.S.C. § 2254(d)(1), *and* that the error
in the MAR court's ruling had a "'substantial and injurious effect or
influence in determining the jury's verdict,'" *Fullwood v. Lee*, 290
F.3d 663, 679 (4th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507
U.S. 619, 637 (1993)). Next, Robinson must establish one of the six
*Townsend* factors. *See Townsend*, 372 U.S. at 313.[2] Even if Robinson
satisfies these requirements, however, we may vacate the district
court's denial of an evidentiary hearing only if its ruling constituted
an abuse of discretion. *See Conner v. Polk*, 407 F.3d 198, 204 (4th
Cir. 2005).

## A.

Pursuant to the foregoing, we must first assess whether the MAR
court's ruling "involved an unreasonable application of[ ] clearly

---

[2]The six *Townsend* factors are:

> (1) the merits of the factual dispute were not resolved in the state
> hearing; (2) the state factual determination is not fairly supported
> by the record as a whole; (3) the fact-finding procedure
> employed by the state court was not adequate to afford a full and
> fair hearing; (4) there is a substantial allegation of newly discov-
> ered evidence; (5) the material facts were not adequately devel-
> oped at the state-court hearing; or (6) for any reason it appears
> that the state trier of fact did not afford the habeas applicant a
> full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained below, the distinction between external and internal jury influences has been clearly delineated by the Supreme Court, and a decision that Robinson's allegations supporting the Bible claim implicate an *internal* influence — rather than an *external* influence — is an unreasonable application of that law.

The panel majority makes two fundamental mistakes in its application of the relevant Supreme Court precedents. First, it obscures the clear principle that emerges from *Parker v. Gladden*, 385 U.S. 363 (1966), *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Remmer v. United States*, 347 U.S. 227 (1954), by artificially splitting those decisions into two categories. Specifically, the panel majority interprets *Parker* and *Turner* as involving "extraneous prejudicial information [that] . . . bears on a fact at issue," which had been introduced to the jury in contravention of the defendant's confrontation rights. *Ante* at 19. It then construes *Remmer* as concerning "an outside influence upon the partiality of the jury" that violated the defendant's right to an impartial jury. *Id.* As explained below, the majority's distinction is unsupported by those decisions, each of which (not merely *Remmer*) involved an external influence that carried the potential to sway the juror against the defendant.[3]

Second, the majority incorrectly defines the internal influences at issue in *Tanner v. United States*, 483 U.S. 107 (1987), as "influences internal to the deliberations process." *Ante* at 19. The multiple examples of internal influences provided by the *Tanner* Court, however, concern a phenomenon much more concrete and distinct: influences that impair a juror's mental or physical capacity.

Given these errors — both of which obfuscate the Court's clear holdings in the *Parker*, *Turner*, *Remmer*, and *Tanner* decisions — it is no surprise that the panel majority ultimately concludes that the line

---

[3]To be sure, the panel majority concedes that "to analyze *Remmer* is to impliedly analyze *Parker* and *Turner*." *Ante* at 17-18 n.14. That point, however, is inconsistent with the majority's analysis of those authorities, which interprets and applies *Parker* and *Turner* as involving extraneous information and *Remmer* as concerning an outside influence.

between external and internal jury influences "is a fine one, and one that may even blur upon close inspection." *Ante* at 21. A fair reading of those decisions, however, presents an unmistakably clear divide between external and internal influences. And when those decisions are properly applied, the Bible claim unquestionably relates to an improper external jury influence.

1.

The first step in our analysis under § 2254(d)(1) is to identify the relevant "clearly established Federal law." That phrase, of course, "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). As explained below, although the panel majority correctly identifies *Parker*, *Turner*, *Remmer*, and *Tanner* as the relevant precedents, it fails to recognize and apply the Court's clear holdings in those decisions.

In its *Parker* decision, the Supreme Court held that Parker's Sixth Amendment rights had been contravened when the "bailiff assigned to shepherd the sequestered jury" remarked in the jury's presence, "'Oh that wicked fellow [petitioner], he is guilty,'" and "'If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it.'" 385 U.S. at 363-64. The panel majority characterizes *Parker* solely as a decision in which the Court held that Parker's confrontation rights were violated because the bailiff's comments constituted "extraneous prejudicial information [that] . . . bears on a fact at issue." *Ante* at 19. This characterization, however, is unsupported by *Parker*'s facts and rationale. Although the bailiff's statement that Parker was guilty could be construed as extraneous "evidence" that "bears on a fact at issue," his remark that the Supreme Court would correct any error in finding him guilty clearly had no evidentiary relevance. Rather, the bailiff's comment was simply an effort on his part to sway the jury to find Parker guilty. The majority's conclusion is also belied by the *Parker* Court's analysis. Although the Court referenced Parker's right to confrontation, it did so only after referring to his right to an impartial jury. *See Parker*, 385 U.S. at 364. Furthermore, the Court characterized the bailiff's statements as unconstitutional "private talk, tending to reach the jury by outside influence," not as extraneous evidence. *Id.* (internal quotation marks omitted). Finally, and

most importantly, the Supreme Court itself has characterized *Parker* as a case involving external influences. *See Tanner*, 483 U.S. at 117.

Whereas *Parker* at least bore traces of an "extraneous prejudicial information" case, the *Turner* decision, which the panel majority also characterizes as such a case, solely concerned an external influence. In *Turner*, the Court held that the defendant's Sixth Amendment rights were contravened where the sequestered jury was "placed in [the] charge" of two deputy sheriffs who were also the "principal witnesses for the prosecution." 379 U.S. at 467. In their role as the jury's caretakers, the deputies drove the jurors where they needed to go, "ate with them, conversed with them, and did errands for them." *Id.* at 468. Crucially, the constitutional problem was not with any information that the deputy sheriffs had imparted to the jurors — indeed the Court operated under the assumption that no such information-sharing had occurred. *See id.* at 473. Rather, the problem was the "relationship" between the deputy sheriffs and the jury, "one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial." *Id.* at 474. The Court's concern was that, as a result of the jury's dependence on the deputies during the trial, their testimony against the defendant would carry greater weight with the jury than it otherwise would. The relationship thus constituted an external influence with the potential to sway the jurors against the defendant, irrespective of any information that might have been conveyed to the jurors by the deputies.[4]

---

[4]Not only does the panel majority erroneously mischaracterize *Parker* and *Turner* as solely concerning "extraneous prejudicial information that bears on a fact at issue in the case," it creates from whole cloth the requirement that such extraneous information "bear on a fact at issue in the case." There is no such requirement in any of the Supreme Court decisions discussed by the majority. The majority seeks to ground its new requirement in Supreme Court precedent by equating evidentiary relevance to prejudice, suggesting that only extraneous information relevant to a fact at issue can prejudice a defendant. *Ante* at 19 n.15. This suggestion is, put most simply, entirely without legal basis. To take an example from *Parker*, the statement by the bailiff that "'[i]f there is anything wrong [in finding petitioner guilty] the Supreme court will correct it," was plainly prejudicial and, just as plainly, had no evidentiary relevance to an issue in the case. 384 U.S. at 363-64. Of significance, the majority's newly minted requirement — first appearing after its analysis of *Parker* and *Turner* — provides the sole basis on which it distinguishes those decisions.

The panel majority contrasts *Parker* and *Turner* with *Remmer*, which concerned an effort to bribe a juror, and which the majority correctly characterizes as involving an external influence. *See* 347 U.S. at 228-29. Yet, whether it was the bailiff's remarks impugning the defendant in *Parker*, the relationship of confidence between the jurors and the deputy sheriffs in *Turner*, or the attempt to bribe the juror in *Remmer*, the same concern animated the Court's decisions: that an external influence might sway the jurors against the defendant.

In contrast to the improper external influences on a jury exemplified in *Parker*, *Turner*, and *Remmer*, internal jury influences are illustrated in *Tanner*. There, the Court held that the Sixth Amendment did not require an evidentiary hearing at which jurors could testify that a fellow juror was under the influence of alcohol and illegal drugs during Tanner's trial. *See* 483 U.S. at 126-27. In so ruling, the Court expressly distinguished the external influences present in cases such as *Parker* and *Remmer* from the internal influence at issue in *Tanner*. *See id.* at 117. The Court explained that the distinction between an external influence, on the one hand, and an internal influence, on the other, depends on the "nature" of the influence, *id.*, and it approvingly observed that lower courts had treated influences affecting "the physical or mental [ ]competence of a juror" as internal influences, *id.* at 118. It also provided several examples of internal influences — in addition to the intoxication at issue in that case — including psychological disorders, insanity, sickness, lack of sleep, hearing impairment, and consumption of poorly prepared food, all of which constitute a physical or mental impairment. *See id.* at 118-19, 122.

The panel majority draws from *Tanner* the following definition of internal influences: those "internal to the deliberations process." *Ante* at 19. Because the majority fails to elaborate, we are left to guess at the meaning of this vague and circular definition. Whatever it means, however, the majority's definition finds no support in *Tanner* and fails to encompass the numerous examples of internal influences provided by the Court in that decision. If by influences "internal to the deliberations process" the panel majority means those that only affect the deliberations process, its definition describes external influences better than internal influences. The external influences recognized by the Court — such as attempted bribery or improper association with the prosecution's witnesses — come from without but impact only the

juror's perception of the defendant, an influence that focuses directly on the final decision a jury must make. In contrast, internal influences — such as intoxication, lack of sleep, and psychological disorders — affect not only a juror's ability to rationally and neutrally deliberate on a defendant's fate, but also a juror's *general* ability to perceive, process, and comprehend the world around him. Perhaps the majority, by the phrase "internal to the deliberations process," means to indicate only those influences that originate in the deliberations process. If so, neither internal nor external influences would fall within its definition. Whether the influence is an improper association with the prosecution's witnesses, an attempted bribe, sickness, or intoxication, it originates outside the jury room.

There is only one reasonable definition to draw from the *Tanner* Court's distinction between external and internal influences, its instructions that the distinction turns on the "nature" of the influence, and the numerous examples it provides of internal influences: If the "nature" of the influence is that it *impairs* the juror's physical or mental ability to function effectively, it is an internal influence. Internal influences thus stand in stark contrast to their external counterparts, which come from without and carry the potential to *bias* the juror against the defendant.

Importantly, this distinction between external and internal jury influences was carefully drawn by the Supreme Court well before the MAR court's 1999 ruling. It therefore constitutes "clearly established Federal law" within the meaning of § 2254(d)(1). *See Williams*, 529 U.S. at 412.

2.

We must next assess whether a decision that the facts alleged by Robinson constitute an internal rather than an external influence is an "unreasonable application" of the law clearly established in *Parker*, *Turner*, *Remmer*, and *Tanner*. 28 U.S.C. § 2254(d)(1). A decision is an "unreasonable application" of clearly established Supreme Court precedent if the "state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts." *Wiggins v. Smith*, 530 U.S. 510, 520 (2003). As we have recognized, a state court determination may be set aside

under this standard if the court "'was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled.'" *Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002) (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000) (plurality opinion)). The mandate of § 2254(d)(1), however, is not satisfied by our independent determination that the state court's application was erroneous; we must also find such application to be unreasonable. *See Williams*, 529 U.S. at 411. Nevertheless, where, as here, the relevant principles are well-defined, the range of reasonableness is narrower. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations."). Given the clarity of the distinction between an external and an internal influence on a jury, a decision that Robinson's allegations constitute an internal influence — rather than an external influence — easily satisfies the "clearly unreasonable" standard.

The panel majority concludes that the provision and reading of the Bible is "not unlike" the internal influences described in *Tanner*. It thus concludes that a decision that Robinson's allegations constitute an internal influence would not be unreasonable. In so ruling, the majority fails to reference the *Tanner* Court's admonition that internal influences are those affecting the "physical or mental [ ]competence of a juror." 483 U.S. at 118. And it declines to analogize to the numerous examples of internal influences provided by the Court in *Tanner*. *See id.* at 118-19, 122. Instead, the majority concludes — without citation to *Tanner* — that reading from the Bible is "not unlike" an internal influence because it "invites the listener to examine his or her own conscience from within," *ante* at 20, a conclusion that finds no support in *Tanner* and bears no resemblance to any of the examples of internal influences provided there. That the majority fails to proceed by analogy to the examples provided in *Tanner* is not surprising, for it would certainly be shocking for a court to compare a Bible reading to intoxication, insanity, exhaustion, psychological disorder, or food poisoning. *See id.* at 118-19, 122 (listing these and others as examples of internal influences). Yet, in labeling the provision and reading of the Bible as an internal influence, the majority has likened a Bible reading to such impairments. Not only is such a con-

clusion empirically false, it should be offensive to those who consider the Bible to be sacred.

In regard to whether Robinson's allegations constitute an external influence, i.e., an influence that comes from without and carries the potential to sway a juror against the defendant, the panel majority suggests that neither the bailiff's provision of the Bible nor the reading of the Bible in the jury room could have influenced the jurors against Robinson. Indeed, although the majority is hesitant to compare Bible reading to intoxication or food poisoning, it is not troubled by comparing the Bible to "aspirin [or] a pen." *Ante* at 24. In so doing, the majority ignores the fact that the Bible is an authoritative code of morality — and even law — to a sizable segment of our population. As in *Turner*, it would be "blinking reality" not to recognize the profound influence that quotations from the Bible could carry in the jury room. 379 U.S. at 473. Moreover, the specific passage read aloud — those concerning the mandate of "an eye for an eye" — bear directly on the severity of punishment to be imposed for a criminal act and expressly require the death penalty as punishment for murder. The majority therefore concludes — alarmingly — that a divine command to condemn a defendant to death carries less potential to influence a juror than the bailiff's comments in *Parker* or the jurors' relationship with the deputy sheriffs in *Turner*. I can neither make nor accept that conclusion.

This case is made all the more egregious by the fact that the Bible was provided to the juror by the trial court's bailiff. The panel majority characterizes the bailiff's actions as an "innocuous intervention," *ante* at 24, but, as the Court explained in *Parker*, "[t]his overlooks the fact that the official character of the bailiff — as an officer of the court as well as the state — beyond question carries great weight with a jury." 385 U.S. at 365. Furthermore, because of the bailiff's capacity as an officer of the court, it is likely that a juror would impute his actions to the court itself, leaving an impression that the court approved of the jury's use of the Bible.

Taken together, the juror's reading of the "an eye for an eye" passage, and the appearance that this reading was sanctioned by the trial court, plainly constitute an external influence with the potential to sway the jury against Robinson. The MAR court's decision to the

contrary was therefore an "unreasonable application" of Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

B.

In order to "allege[ ] facts which, if proved, would entitle him to relief," as required by *Townsend*, 372 U.S. at 312-13, Robinson must also demonstrate that the error in the MAR court's ruling had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Fullwood*, 290 F.3d at 679 (quoting *Brecht*, 507 U.S. at 637). Because Robinson's allegations give rise to a rebuttable presumption of prejudice, they also satisfy this requirement.

In *Remmer*, the Supreme Court announced that, "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial . . . is, for obvious reasons, deemed presumptively prejudicial." 347 U.S. at 229. We have had occasion to apply *Remmer* and elaborate on the circumstances in which its presumption of prejudice arises. In *Stockton v. Virginia*, we held that the presumption of prejudice arose where the proprietor of a restaurant at which the jury ate lunch during deliberations told jurors that "they ought to fry the son of a bitch." 852 F.2d 740, 741, 744 (4th Cir. 1988); *see also Fullwood*, 290 F.3d at 681-82 (concluding that presumption of prejudice arose where defendant alleged that juror's husband had attempted to convince her to vote for death penalty). We explained in *Stockton* that, in order to invoke the presumption, a defendant must "establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." 852 F.2d at 743. In so ruling, we explicitly distinguished such outside contacts from *Tanner*-like situations involving "juror impairment or predisposition." *Id.* at 744.

Robinson's allegations plainly satisfy the two-step rule set forth in *Stockton*. First, the bailiff's furnishing of the Bible to the juror was an unauthorized contact with the jury. Second, such contact "reasonably draw[s] into question the integrity" of the jury's recommendation that Robinson be sentenced to death. *Stockton*, 852 F.2d at 743. As discussed above, the Bible is one of the most influential texts known to our culture and represents, to many, God's explicit commands. Fur-

thermore, as in *Stockton*, the passage read aloud in the jury room "bore on the exact issue — whether to impose the death penalty — that the jurors were deliberating at that time," and thus carried a serious potential for prejudice. *Id.* at 746; *see also McNair v. Campbell*, 416 F.3d 1291, 1307-08 (11th Cir. 2005) (concluding that introduction of Bible into jury room gives rise to presumption of prejudice). The presumption of prejudice, of course, "is not one to be casually invoked." *Stockton*, 852 F.2d at 745. The circumstances of this case, however, more than justify its invocation.

## C.

Finally, in order to demonstrate entitlement to an evidentiary hearing, Robinson must establish one of the *Townsend* factors, and we must find that the district court abused its discretion in denying him such a hearing. Robinson satisfies each of these requirements. First, in concluding that Robinson's allegations did not entitle him to relief, the MAR court denied Robinson a hearing on the Bible claim without finding any facts. Thus Robinson satisfies at least the fifth *Townsend* factor, that "the material facts were not adequately developed at the state-court hearing." 372 U.S. at 313. Second, the district court committed an error of law in denying Robinson an evidentiary hearing on the basis that the law students' affidavits were insufficient to warrant an evidentiary hearing, for it is settled that allegations alone are sufficient to warrant a hearing where, taken as true, they entitle a petitioner to relief. *See id.* at 312; *Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005). By definition, such an error of law constitutes an abuse of discretion. *See United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005).

## II.

Pursuant to the foregoing, Robinson is entitled to an evidentiary hearing on the Bible claim, and I would vacate and remand for such further proceedings as may be appropriate.

With respect, I most strenuously dissent.