UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-22

JOHN YANCEY SCHMITT,

Petitioner - Appellant,

versus

LORETTA K. KELLY, Warden, Sussex I State
Prison,

Respondent - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  Robert E. Payne, District
Judge.  (CA-02-953-3-REP)

Argued:  May 25, 2006                    Decided:  July 13, 2006

Before WILLIAMS and MICHAEL, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Dana Johannes Finberg, LECLAIR RYAN, P.C., Richmond,
Virginia, for Appellant.  John H. McLees, Jr., Senior Assistant
Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA,
Richmond, Virginia, for Appellee.  **ON BRIEF:** Barbara L. Hartung,
Richmond, Virginia; David J. Sensenig, LECLAIR RYAN, P.C.,
Richmond, Virginia, for Appellant.  Robert F. McDonnell, Attorney
General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney
General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond,
Virginia, for Appellee.

―――――――――――

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Petitioner-appellant John Yancey Schmitt appeals the district court's denial of his habeas petition filed under 28 U.S.C.A. § 2254 (West Supp. 2005). The district court granted a certificate of appealability to Schmitt on the following six claims: (1) whether the Virginia Supreme Court's holding that the exclusion of evidence relating to general prison security and prison life at state prisons was reasonable under Supreme Court precedent; (2) whether impeachment evidence suppressed by the prosecution violated Brady[1]; (3) whether Schmitt's trial counsel were ineffective for failing to preserve his prosecutorial misconduct claim by moving for a mistrial at the appropriate time; (4) whether prosecutorial misconduct rendered Schmitt's trial unfair; (5) whether Schmitt's Massiah claim[2] was procedurally defaulted; and (6) whether Schmitt's trial counsel were ineffective for failing to file a pretrial motion to suppress a tape that thereby waived Schmitt's

---

[1]A defendant's due process rights are violated pursuant to Brady v. Maryland, 373 U.S. 83 (1963), when the prosecution suppresses evidence favorable to the defendant that is material to either the defendant's guilt or punishment.

[2]A Massiah v. United States, 377 U.S. 201 (1964), violation occurs when the "government deliberately elicit[s] incriminating evidence from an accused after he has been indicted and in the absence of his counsel." United States v. Kennedy, 372 U.S. 686, 692 (4th Cir. 2004) (internal quotation marks and alterations omitted).

Massiah claim.  Finding no error in the district court's adjudication of Schmitt's claims, we affirm.

## I.  Procedural History

### A. Proceedings in the Trial Court

On January 19, 1999, Schmitt robbed a Nationsbank in Chesterfield County, Virginia, taking more than $65,000.  At the time of the robbery, Schmitt was on probation for a prior conviction for unlawful possession of a firearm by a convicted felon.  With part of the money from the robbery, Schmitt purchased a car.  Cliff Sauer, Schmitt's former employer and friend, helped broker the car deal.  After the closing of the car deal, Sauer, aware that Schmitt had not been gainfully employed in quite sometime, asked Schmitt about where he had obtained the funds for the new car.  Eventually, Schmitt told Sauer that he had robbed a bank.  Sauer did not contact the police with this information.

On January 30, 1999, Schmitt and his girlfriend were staying at a local hotel in Henrico County, Virginia and the hotel received noise complaints regarding Schmitt's room.  When the police came to investigate, Schmitt became belligerent and refused to comply with the police officer's instructions.  Schmitt was arrested for obstruction of justice.  During the booking process, Schmitt told the police he was James Cromer.[3]  Pretending to be James Cromer,

---

[3]Cromer was a mutual friend of Schmitt and Sauer.

4

Schmitt called Sauer from the Henrico County jail and asked Sauer to bail him out of jail. Sauer, believing he was assisting Cromer, complied with the request and bailed Schmitt out of jail.

On February 17, 1999, Schmitt entered the same Nationsbank in Chesterfield County, Virginia and robbed it again. This time, however, Schmitt shot and killed the bank's security guard. The robbery was captured on the bank's security cameras, but the shooting occurred outside the view of the cameras. Schmitt fled the bank and checked into a hotel under a false name. The Chesterfield County Police Department tracked Schmitt to the hotel, and Lieutenant Clarcq negotiated his surrender. During the negotiations, Schmitt told Lt. Clarcq that he had not intended to shoot the security guard, and he expressed concern for his family and the family of the victim.

After the second robbery and the murder, but before Schmitt was apprehended, the Chesterfield County police contacted Sauer. Sauer cooperated with the police and disclosed his knowledge of the first bank robbery and the car deal. Sauer provided the police with the information that led to Schmitt's arrest. After Schmitt's arrest, the police again sought assistance from Sauer, asking him to tape record any telephone conversations he would have with Schmitt. Complying with this request, Sauer recorded a conversation that would become a key piece of the prosecution's penalty phase evidence. During this recorded conversation, Schmitt

5

made several incriminating and exculpatory statements regarding the robbery and murder. Schmitt expressed concern over his friends that had been implicated in the robbery, including the young lady who drove him to the hotel. Schmitt also expressed confidence in beating the murder charge because he claimed he did not intend to shoot or kill the security guard. Schmitt explained that there was a fight and that the security guard grabbed his gun. Schmitt described in detail how he grabbed the security guard's hand and how he had scratches on himself to prove the struggle. Schmitt believed that he committed manslaughter because he lacked the intent to kill. Schmitt also laughingly described to Sauer how the security guard's "eyes got real big" when he pointed the gun at him. Changing topics, Schmitt then described the amenities of the prison. He said the prison was "nice" and noted that it had cable television, ping-pong, microwaves, single cells, and reasonable prices at the canteen.

The Commonwealth of Virginia indicted Schmitt for capital murder, armed entry of a bank with intent to commit larceny, two counts of robbery, and three counts of use of a firearm in violation of Virginia Code § 18.2-53.1 (2004). Faced with a defendant who wished to proceed to trial in spite of the mountain of evidence against him, Schmitt's trial co-counsel, Mr. Cooley and Mr. Collins, turned their attention to trial strategy. Schmitt's attorneys weighed the possibility of moving to suppress the

telephone call between Sauer and Schmitt. They ultimately concluded, however, that if the prosecution entered the tape into evidence during the guilt phase of the trial, which they believed was a strong possibility, they could use the tape to Schmitt's advantage by arguing that the shooting was unintentional. This was a critical decision because Virginia law requires that all defense motions seeking to suppress evidence on the basis of violations of the U.S. Constitution, whether the evidence is for use at trial or sentencing, be filed no later than seven days before trial. See Va. Code Ann. § 19.2-266.2 (Supp. 2005)(stating "Defense motions or objections seeking . . . suppression of evidence on the grounds such evidence was obtained in violation of the provisions of the Fourth, Fifth, or Sixth Amendments to the Constitution of the United States or Article I, Section 8, 10, or 11 of the Constitution of Virginia proscribing illegal searches and seizures and protecting rights against self-incrimination . . . shall be raised by motion or objection, in writing, before trial. The motions or objections shall be filed and notice given to opposing counsel not later than seven days before trial . . . . The court may, however, for good cause shown and in the interest of justice, permit the motions or objections to be raised at a later time.").

At trial, the prosecution presented the surveillance video and eye witnesses who identified Schmitt as the bank robber. The prosecution also presented forensic evidence indicating that the

7

security guard had been shot from a distance of 12 to 36 inches and that the security guard's gun never left its holster during the robbery. A search of the hotel room in which Schmitt was arrested revealed a handgun, shotgun shells, newly purchased clothing and $27,091 in cash bearing "bank bands" identifying the money as from Nationsbank. The prosecution chose not to introduce the Sauer/Schmitt tape in the guilt phase and the state trial court ruled against Schmitt's attempt to proffer the tape, finding that the tape could not be admitted as a "declaration against interest" because Schmitt was an available witness. The jury convicted Schmitt on all counts.

At the sentencing phase, the prosecution produced evidence of Schmitt's prior convictions, his drug-dealer lifestyle, the bank robberies, the Sauer/Schmitt tape, the hotel arrest, and testimony from the victim's family. The prosecution sought the death penalty based on Schmitt's future dangerousness and the vileness of the murder. The prosecution used Sauer to introduce the Sauer/Schmitt tape. Schmitt objected to the introduction of Sauer's testimony and the Sauer/Schmitt tape, arguing that it violated his Fifth and Sixth Amendment rights according to Massiah because Sauer was acting as an agent of the Commonwealth at the time of the conversation and when Sauer elicited incriminating statements from Schmitt. The prosecution argued that Schmitt had waived any argument relating to such constitutional rights by failing to file

8

a pre-trial motion to suppress the tape and other evidence. The state trial court reviewed the tape and then overruled Schmitt's objection. Sauer also testified that Schmitt asked him to drive for him during the second robbery and offered to buy Sauer's gun, but Sauer rejected both offers. The prosecution also argued to the jury that Schmitt had tricked the prison system and the probation system by giving a false name and failing to comply with the terms of his probation.

Schmitt presented evidence from Lt. Clarcq, the police negotiator, describing the remorse Schmitt expressed from the shooting and a medical specialist who testified about the effects of drug addiction. Schmitt also attempted to have the Chief of Operations of the Virginia Department of Corrections, Gary Bass, testify to the protections at maximum security prisons and the general prison conditions in Virginia. The trial court, however, allowed Mr. Bass to testify only that a life sentence means life without parole. Friends and family also testified on Schmitt's behalf. Finding the future dangerousness aggravator present, the jury recommended the death sentence for Schmitt and 118 years' imprisonment on the remaining charges.

B. The Virginia Supreme Court's Decision on Direct Appeal

Schmitt timely filed a direct appeal of his conviction and sentence in the Virginia Supreme Court. Schmitt alleged numerous errors in the jury selection, guilt, and sentencing phases.

9

Relevant to our inquiry, Schmitt alleged that the trial court erred by admitting into evidence the recorded telephone conversation between Sauer and Schmitt because it violated Schmitt's Sixth Amendment right to counsel established under Massiah v. United States, 377 U.S. 201 (1964). The Commonwealth responded that this claim was procedurally defaulted pursuant to Virginia Code § 19.2-266.2 because Schmitt raised it after the trial began. The Virginia Supreme Court agreed that the claim was procedurally defaulted. Next, Schmitt argued that the trial court erred in "refusing to admit evidence concerning prison life and the security features of a 'maximum security' prison in the Commonwealth to rebut the Commonwealth's contention of Schmitt's future dangerousness." (J.A. at 390.) The Virginia Supreme Court rejected this argument on the merits, reasoning that "Schmitt's proffered evidence was not admissible to rebut any particular evidence concerning prison security or prison conditions offered by the Commonwealth." (J.A. at 390.) The Virginia Supreme Court further noted that evidence of maximum security prison features did not constitute mitigation evidence because "the relevant inquiry" in assessing a defendant's future dangerousness rests on whether the defendant "would" commit future acts while in prison, as opposed to whether the defendant "could" commit such acts. (J.A. at 390.) Finally, Schmitt alleged that he was entitled to a mistrial based on improper and inflammatory arguments made by the

10

prosecution during its closing argument. The Virginia Supreme Court noted that the trial court provided appropriate curative instructions each time that Schmitt's counsel objected to the prosecution's statements during closing argument. It further concluded that Schmitt's counsel did not preserve the mistrial motion with respect to some of the prosecution's comments because that motion was made after the jury left the courtroom. Thus, the request for a mistrial based on those portions of the prosecution's closing argument was procedurally defaulted. Ultimately, the Virginia Supreme Court affirmed Schmitt's conviction and sentence.

C.  The Virginia Supreme Court's Decision on Habeas Review

On state habeas review, Schmitt reasserted his previous claims and added ineffective assistance of counsel claims. The Virginia Supreme Court held that because Schmitt raised these claims on direct appeal they were barred from habeas review. The Virginia Supreme Court then turned its attention to the ineffective assistance of counsel claims. Schmitt alleged that his counsel were ineffective for failing to move to suppress the Sauer/Schmitt tape on Massiah grounds. The Virginia Supreme Court found that the claim satisfied neither the prejudice nor performance prong of the Strickland v. Washington, 466 U.S. 668 (1984) test, because Sauer was not acting as an agent of the state and therefore no basis existed for the suppression motion. Schmitt also alleged ineffective assistance of counsel based on his counsel's failure to

11

move for a mistrial after the prosecution's closing arguments. Again, the Virginia Supreme Court found the claims to be unpersuasive because Schmitt failed to demonstrate how he could have prevailed on the mistrial motion in light of counsel's objections and the trial court's curative instructions.

D.  The District Court's Decision on Federal Habeas Review

Having exhausted his state-court remedies, Schmitt filed a 28 U.S.C.A. § 2254 petition in the Eastern District of Virginia alleging twenty-four grounds for relief, including the six before us. The district court denied relief on Schmitt's claim that the exclusion of general prison security evidence violated his due process rights, reasoning that the Supreme Court has never held that a defendant is entitled to present "all evidence that may touch on [the defendant's] future sentence," such as the security features of prisons in which Schmitt may or may not be stationed.

The district court conducted extensive evidentiary hearings as to the remaining five claims before us. First, the district court found Schmitt's <u>Massiah</u> claim relating to the taping of the Sauer/Schmitt telephone call to be unreviewable because the Virginia Supreme Court deemed it was procedurally defaulted. Second, the district court concluded that ineffective assistance of counsel did not excuse the procedural default because the decision not to move to suppress the tape was the product of a well-reasoned

12

defense strategy.[4]  Third, the district court addressed Schmitt's Brady claim, in which Schmitt alleged that the Commonwealth suppressed impeachment evidence relating to Sauer because the Commonwealth failed to disclose that Sauer received use immunity for his grand jury testimony, that Sauer was working for the police prior to Schmitt's capture, that Sauer was mentally unstable, and that the Commonwealth had provided Sauer with a free mental health evaluation.  The district court concluded that the suppressed facts constituted impeachment evidence, but that the suppressed evidence was not material.  Fourth, the district court denied relief on Schmitt's claims that the prosecution's improper closing arguments entitled Schmitt to a mistrial because the claim was procedurally defaulted.  And finally, the district court concluded that no ineffective assistance of counsel excused the procedural default of the mistrial motion.

The district court granted a certificate of appealability on these six claims, and we have jurisdiction to review the district court's denial of the writ of habeas corpus pursuant to 28 U.S.C.A. § 2253 (West Supp. 2005) (providing appellate courts with

---

[4]In doing so, the district court concluded that the Virginia Supreme Court erred when it held that Sauer was not acting as an agent for the state when he recorded the telephone call.  The Commonwealth has not appealed this holding and, for purposes of this opinion, we will assume that Sauer was acting as an agent of the Commonwealth.

13

jurisdiction to review final orders from habeas proceedings if a certificate of appealability has issued).

## II. Analysis

"In reviewing the district court's denial of [Schmitt's] habeas petition, we review the district court's conclusions of law de novo and its findings of fact for clear error. Billings v. Polk, 441 F.3d 238, 243 (4th Cir. 2006). "We review de novo the district court's decision to deny a § 2254 petition based on the record before the [state habeas court], applying the same standards as the district court." Robinson v. Polk, 438 F.3d 350, 354-55 (4th Cir. 2006). "[W]here a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo." Monroe v. Angelone, 323 F.3d 286, 297 (4th Cir. 2003). Conversely, relief may not be granted on a claim that has been adjudicated by the state court unless the "state court decision was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court" or the decision was based on an unreasonable determination of the facts. Robinson, 438 F.3d at 354. "A decision of a state court is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." Id. at 355 (internal quotation marks and

alterations omitted). "The phrase 'clearly established law' refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." Id. (internal quotation marks and alterations omitted). "A state court adjudication is an unreasonable application of federal law when the state court 'correctly identifies that governing legal rule from the Supreme Court's cases but applies it unreasonably to the facts of a particular case or applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable or fails to apply the principle of a precedent in a context where such failure is unreasonable." Id. (internal quotation marks and alterations omitted).

We also may not review claims that the state court has held were procedurally defaulted on independent and adequate state grounds absent a showing of cause and prejudice. Strickler v. Greene, 527 U.S. 263, 282 (1999). Utilizing these standards, we examine each of Schmitt's claims.

A. Prison Security and Prison Life Claim

Schmitt's first argument is that the exclusion of evidence relating to general prison security and prison life during the sentencing phase of his trial violated his right to present rebuttal evidence as established by Gardner v. Florida, 430 U.S. 349 (1977), Skipper v. South Carolina, 476 U.S. 1 (1986), and

15

<u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994)(plurality opinion).[5] Schmitt proffered the testimony of Gary Bass, a senior member of the Virginia Department of Corrections, to describe the security features at Virginia's maximum security prisons in rebuttal to the Commonwealth's future dangerousness argument. Bass would not have testified to Schmitt's individual capacity to conform to prison life, but only to general evidence of how state maximum security prisons manage prisoners.

Schmitt contends that he needed to present evidence relating to general prison security and the nature of life at a maximum security prison to rebut the Commonwealth's argument that "the system" could not be trusted to prevent him from committing future acts of violence, and that he would enjoy pleasant amenities while incarcerated. The Virginia Supreme Court rejected Schmitt's

---

[5]To the extent Schmitt contends that general evidence of prison life and prison security features constitute relevant mitigating evidence under the Eighth Amendment and Fourteenth Amendment, his claim is without merit. The Supreme Court has never held that a defendant may present general evidence relating to prison life and security as mitigating evidence. To the contrary, the Supreme Court has repeatedly noted that mitigating evidence should relate to the <u>individual</u> defendant and why that defendant should or should not be sentenced to death. <u>See</u> <u>Skipper</u>, 476 U.S. at 4; <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978)(plurality opinion); <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 113-14 (1982); <u>see also</u> <u>United States v. Johnson</u>, 223 F.3d 665, 674-75 (7th Cir. 2000) (noting that a defendant should not have been entitled to "present to the jury . . . evidence of the existence of maximum-security federal prisons decked out with control units, in order to establish a mitigating factor. A mitigating factor is a factor arguing against sentencing <u>this</u> defendant to death; it is not an argument against the death penalty in general." (emphasis in original)).

16

argument, holding that because the Commonwealth "did not present evidence concerning prison security or the nature of prison confinement" Schmitt was not entitled to present such evidence in rebuttal. (J.A. at 390.) The Virginia Supreme Court also rejected Schmitt's general claim that evidence relating to prison security should always be admissible to rebut a future dangerousness argument.

As established above, we cannot grant relief unless the Virginia Supreme Court's decision was contrary to clearly established federal law, was based on an unreasonable application of clearly established law, or was based on an unreasonable determination of the facts. We begin by assessing whether the inclusion of a future dangerousness aggravator necessarily gives rise to the right to present general prison security evidence and then evaluating whether Schmitt needed to present Bass's testimony to rebut the Commonwealth's evidence relating to prison security and prison life.

Here, Schmitt presents us with the same arguments that he presented to the district court. Schmitt relies on Skipper's language that "it is . . . [an] elemental due process requirement that a defendant not be sentenced to death on the basis of information which he had no opportunity to deny or explain." Skipper, 476 at 5 n.1. Schmitt also points to language in Simmons stating that juries may and should consider a "defendant's likely

17

conduct in prison" when evaluating the future dangerousness factor.[6]  Simmons, 512 U.S. at 171.  Gardner established that due process is violated when a defendant is forbidden from rebutting the prosecution's evidence in support of the death penalty.

The district court correctly concluded that "the Supreme Court has not addressed directly the right of a capital defendant to present evidence of his prison security conditions when future dangerousness is placed in issue, [therefore] the refusal of the Virginia courts to permit evidence on that point does not run contrary to a decision of the Supreme Court."  (J.A. at 733.)  We also agree with the district court's reasoning that the Virginia Supreme Court did not unreasonably apply the holdings of Simmons, Gardner, and Skipper.  Although these cases clearly establish that a defendant has a due process right to present rebuttal evidence, they do not define rebuttal evidence to include evidence that merely describes the general conditions of incarceration, as opposed to evidence about how the conditions of confinement would affect a particular defendant.  The district court aptly noted that

---

[6]The actual holding of Simmons is that when the prosecution seeks the death penalty based on future dangerousness, a defendant is entitled to a jury instruction that life imprisonment means no possibility of parole.  512 U.S. at 161.  Here, Schmitt is not arguing that the trial court did not conform to this holding as Bass testified that a life sentence means no possibility of parole, and we are limited to examining whether the Virginia Supreme Court's decision is contrary to the holdings, not the dicta of Supreme Court precedent.  See Robinson, 438 F.3d at 355.

18

in <u>Young v. Catoe</u>, 205 F.3d 750, 763 (4th Cir. 2000), we rejected the defendant's argument to expand <u>Simmons</u>, finding that <u>Simmons</u> does not require that a jury be informed that the defendant would be ineligible for parole for thirty years, even though <u>Simmons</u> provides that juries should be instructed that a life sentence means life imprisonment. Thus, the district court was correct in concluding that it is not an unreasonable application of clearly established federal law to bar admission of evidence relating to general prison security and prison life when the prosecution, although arguing for the death penalty based on future dangerousness, never argues that general prison security and prison life factors support a death sentence.

Having concluded that Supreme Court precedent does not require that defendants be allowed to present evidence of general prison security features to rebut a future dangerousness argument, we address whether Schmitt had a right to use Bass's testimony to rebut specific evidence of prison security and conditions presented by the prosecution. During its closing argument, the Commonwealth argued that "the system," namely the Department of Probation and Parole, had failed to keep Schmitt from preventing future crimes, as he was on probation at the time of the murder. (J.A. at 363.) The Commonwealth also noted Schmitt's prior manipulation of "the system" as he provided a false name to the police after his arrest on January 30. In his summation, the prosecutor stated

19

> I would urge you not to trust the system that can be so easily manipulated by the defendant, but Mr. Cooley says don't worry about that. He's going to be locked up for the rest of his life, and you look at me and say isn't that right, Mr. Commonwealth. I'm going to tell you something. There's not one person on this planet that can predict the future. If you want to give him life, you roll the dice because you know from what you've heard that John Yancey Schmitt is a fist full of matches.

(J.A. at 365-66.)

After reviewing the record, we agree with the Virginia Supreme Court that the Commonwealth did not argue that general prison security features were inadequate to protect against Schmitt's future dangerousness. The Commonwealth's "don't trust the system" argument focused not on the prison security features, but on Schmitt's failure to comply with the Department of Corrections' protocol, by committing crimes while on probation, and by Schmitt's deceitfulness in providing the police with a false name. In essence, the Commonwealth argued to the jury that "the system" could not be trusted based on Schmitt's prior actions. Schmitt has failed to direct us to any statements by the Commonwealth specifically discussing security aspects of the prison, such as the frequency of prison escapes, prisoner-on-prisoner assaults, or murders in prison. In fact, Schmitt even admits that his "probation violations and his successful deception of the Henrico [County] authorities became the highlight of lead prosecutor Von Schuch's argument for his death sentence." (Appellant's Reply Br.

20

at 4.)  Because the Commonwealth's sentencing arguments focused on Schmitt's character, his propensity for violent acts and his manipulation of the state prison and probation systems, the statements were decidedly not general statements about prison security features that could give rise to the right to present rebuttal evidence in the form of general prison security features.[7]

In summary, we deny Schmitt's claim because the Virginia Supreme Court did not err in holding that evidence relating to general prison security is inadmissible to rebut a future dangerousness argument when the prosecution has not placed general prison security evidence before the jury.  We also conclude that

_____

[7]Schmitt also argues that the Commonwealth actually presented evidence of prison life through the introduction of the Sauer/Schmitt tape.  During the sentencing phase, the Commonwealth introduced the Sauer/Schmitt tape in which Schmitt himself discussed the amenities of the local jail, including cable television, microwave ovens, ping pong, and reasonable prices at the canteen (the amenities).  Despite our conclusion that the prosecution introduced prison life evidence, we cannot grant relief on this claim because the local jail's amenities had no relevance to the jury's determination of whether the murder was particularly vile or whether Schmitt has a propensity to commit future acts of violence.  See e.g., Skipper, 476 U.S. at 7 n.2 (noting that how often the defendant showers in prison "is irrelevant to the sentencing determination").  Thus, to the extent that evidence of prison life was entered into evidence, such evidence did not have a substantial and injurious effect on the jury's determination of whether the aggravating factors of vileness or future dangerousness were present.  See Richmond v. Polk, 375 F.3d 309, 335 (4th Cir. 2004) ("[P]rinciples of comity and respect for state court judgments preclude federal courts from granting habeas relief to state prisoners for constitutional errors committed in state court absent a showing that the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'"(quoting Brecht v. Abrahamson, 507 U.S. 619 (1993)).

the Virginia Supreme Court reasonably determined that the Commonwealth did not present general evidence of prison security.

### B.  Brady Claim

We next address Schmitt's claim that the prosecution suppressed material impeachment evidence.  Schmitt alleges that the Commonwealth violated the dictates of Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose that Sauer received use immunity for his grand jury testimony, that Sauer was working for the police prior to Schmitt's capture, that Sauer was mentally unstable, and that the Commonwealth provided Sauer with a free mental health evaluation.  Schmitt did not exhaust this claim in state court because the factual underpinnings of the claim came to light only on federal habeas review.  Ordinarily, an unexhausted claim is procedurally defaulted and we may only review the claim if the defendant demonstrates cause and prejudice for the default. Strickler, 527 U.S. at 282.  The Supreme Court, however, has held that in reviewing Brady claims, the Strickler cause and prejudice prongs overlap with two of the three elements of a Brady claim. A successful Brady claim, requires that the defendant demonstrate that (1) the suppressed evidence was favorable, either as exculpatory evidence or impeachment material, (2) the government suppressed the impeachment or exculpatory evidence either willfully or inadvertently, and (3) the suppressed evidence was material. See Monroe, 323 F.3d at 298.  "Corresponding to the second Brady

22

component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third Brady component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for Brady purposes." Banks v. Dretke, 540 U.S. 668, 691 (2004). Because no state court adjudicated Schmitt's Brady claim, we will review the claim de novo. See Monroe, 323 F.3d at 297 ("AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on Brady material that has surfaced for the first time during federal proceedings.").

Because the Commonwealth does not challenge that it suppressed the evidence relating to Sauer or that the evidence had impeachment value, we turn to the materiality prong.

Kyles v. Whitley, 514 U.S. 419 (1995) instructs that the materiality standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. "In short, [Schmitt] must show a reasonable probability of a different result." Banks, 540 U.S. at 699. Because Schmitt's Brady claim relates entirely to the ability to impeach Sauer, who testified only at the sentencing phase of the trial, we need only determine whether Schmitt has demonstrated a reasonable probability that the

23

jury, armed with the suppressed evidence, would have given him a life sentence.[8]

We begin by summarizing the evidence presented to the jury at the sentencing phase. The prosecution introduced evidence of Schmitt's prior convictions, which included two convictions for possession of marijuana with intent to distribute, one conviction for receipt of stolen property, one conviction for felon in possession of a firearm, and one conviction for possession of marijuana. The prosecution also presented testimony from Schmitt's former probation officers; JoAnna Murphy, Schmitt's friend; Kenny Lockner, the owner of the gun used in the first robbery; the officer involved in the hotel arrest; and victim impact testimony from the security guard's family. The probation officers testified that Schmitt violated his probation by failing drug tests, missing his outpatient drug treatment meetings, never demonstrating that he was gainfully employed, missing his mandatory probation meetings,

---

[8]To the extent that Schmitt argues that the suppressed impeachment evidence may have encouraged his trial counsel to move to suppress the Sauer/Schmitt tape pre-trial because the suppressed impeachment evidence included evidence that Sauer was working as a government agent, this claim is without merit. As developed more fully in the text infra in Part II-F, Schmitt's attorneys were well aware that they had a valid basis under Massiah for moving to suppress the Sauer/Schmitt tape. After much deliberation, his counsel determined that the tape could be more helpful than harmful and they chose not to move to suppress it. The additional information would not have altered this strategic decision because it bore no relationship to Schmitt's counsel's tardy filing of the suppression motion.

24

and missing his court appearances. Joanna Murphy testified that she saw Schmitt with a sawed off shotgun just prior to the first robbery and that after she learned of the first robbery, Schmitt took her to the mall to buy approximately three hundred dollars worth of new clothes. Kenny Lockner, a former friend of Schmitt, testified that Schmitt used his (Lockner's) shotgun in the first bank robbery without his knowledge. The prosecution also presented testimony from the officer involved in the hotel incident who described the belligerent acts leading to Schmitt's arrest on that night and the false name provided by Schmitt. The prosecution then presented victim impact testimony from the security guard's family. The mother of the security guard testified to her son's popularity, his twenty years of service in the United States Army, and the community foundation that was established in memory of her son.

Finally, at the conclusion of the sentencing phase, the prosecution called Sauer. First and foremost, the prosecution used Sauer to introduce the Sauer/Schmitt tape. It was during this taped conversation that Schmitt stated his confidence in beating the murder charge, used profanity, laughingly described the security guard's reaction to the sight of his gun, stated his commitment to carrying out the robbery even though it required shooting the security guard, and described the amenities of the county jail. Sauer also testified that Schmitt tried to purchase a gun from him and that Schmitt threatened to kill Joanna Murphy

after the first bank robbery out of fear that Murphy would turn him into the police. Sauer then described the incident where Schmitt called him pretending to be James Cromer and requested that he be bailed out of jail.

In his defense, Schmitt presented mitigation testimony from Lt. Clarcq, the officer who negotiated his surrender; Dr. Bright, an adolescent addiction specialist; Gary Bass, a Department of Corrections employee; and various family members and friends. Lt. Clarcq testified that while negotiating Schmitt's surrender, Schmitt stated that he robbed the bank to obtain drug money and that he never intended to kill anyone. Dr. Bright testified that the withdrawal symptoms felt by a cocaine addict include cravings, depression, anxiety, paranoia, boredom, memory problems, and suicidal ideation. Dr. Bright, however, informed the jury that he had not evaluated Schmitt. Mr. Cooley used Dr. Bright's testimony to support his opinion that Schmitt's drug addiction drove him to rob the banks and shoot the security guard and that when not on drugs, Schmitt was a good person. Gary Bass testified that a life sentence means life without the possibility of parole. And Schmitt's family and friends testified that he had redeeming qualities, such as always being courteous, kind and respectful, and was a pleasant individual when not on drugs.

Because the suppressed evidence could only have been used to impeach Sauer's credibility, our confidence in the jury's verdict

26

has not been undermined. Schmitt cannot demonstrate that the jury would have imposed a life sentence had they have known that Sauer was working with the government and that he had received mental health services. One of the most damaging portions of the prosecution's case was the Sauer/Schmitt tape and, more specifically, the very statements made by Schmitt during the conversation. Schmitt could not have used the suppressed impeachment evidence to bar the introduction of the tape after the trial began, nor could the evidence have been used to impeach Schmitt's damaging remarks.[9] At most, the impeachment evidence could have been used to discredit Sauer's statement that Schmitt offered to buy his gun to use presumably in the bank robberies and that Schmitt threatened to kill Joanna Murphy. This would have been of little help to Schmitt because Schmitt had already stipulated to the fact that he was a convicted felon and thus he illegally possessed the gun used in the murder. Moreover, the jury had already heard that Schmitt had taken Lockner's gun for use in the first robbery. Also, Joanna Murphy's own testimony cast doubt on the alleged threat to kill her because she testified that Schmitt took her shopping when he learned that she knew about the first robbery -- as opposed to killing her because of her knowledge. The ability further to impeach Sauer on the alleged

---

[9]Schmitt did not contest the authenticity of the tape and his mental instability would not have affected the authentication.

27

threat against Joanna Murphy is, alone, insufficient to warrant a finding that the jury would not have imposed the death penalty. Lastly, the impeachment evidence would have done little to curtail the harm from Sauer's testimony about Schmitt pretending to be James Cromer because the arresting officer had already provided corroborating evidence of the arrest and the false name.

Even if the jury used the suppressed evidence to discredit all of Sauer's testimony, the underlying facts would not have changed. At the end of the day, the jury reviewed Schmitt's lengthy criminal record and listened to his damaging statements on the Sauer/Schmitt tape, his probation officers testify to Schmitt's failure to become a law-abiding citizen after being convicted multiple times, his drug abuse, his evasion of the police, and how he took the life of a respected and loved member of the community. It also bears noting that the same jury had just found Schmitt guilty of capital murder and robbing the same bank twice within six weeks, which undoubtedly is powerful evidence of future dangerousness.[10]

---

[10]Schmitt urges this court to find that his case is no different than Banks v. Dretke, 540 U.S. 668 (2004), in which the Supreme Court found all three elements of a Brady claim satisfied where the prosecution suppressed the paid informant status of one of the prosecution's key witnesses. The facts of Banks are materially distinguishable from our case. In Banks, the Supreme Court found that the informant's testimony was key to the prosecution's case during the guilt and sentencing phases. Id. at 698. Here, by contrast the Sauer/Schmitt tape was key to the Commonwealth's penalty case, but Sauer's live testimony was not. The Court also noted in Banks that the defendant was denied the opportunity to "probe" the informant's credibility through cross-

In summary, we conclude that Schmitt has not demonstrated prejudice from the suppression or that the suppressed evidence was material because the suppressed evidence does not "put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 291 (internal quotation marks omitted).

## C. Ineffective Assistance Claim

Schmitt alleges that his trial counsel were ineffective for failing to move for a mistrial prior to the jury leaving the courtroom, which would have preserved Schmitt's prosecutorial misconduct argument. The Virginia Supreme Court on state habeas review found that the failure to move for a mistrial at the proper time did not satisfy the performance or the prejudice prongs of the Strickland test. Because the Virginia Supreme Court reached the merits of this ineffective assistance of counsel claim, we must examine their conclusions under the strictures of 28 U.S.C.A. § 2254.

---

examination. Id. at 701. Here, any cross-examination on Sauer's grant of immunity, his mental status, and the free mental health screening provided by the government could not have cast doubt on the damaging statements made by Schmitt during the taped conversation. Furthermore, in Banks the paid informant testified to the defendant's "propensity to commit violent acts," which was crucial because the defendant did not have a criminal record. Id. at 700. Here, Schmitt had a lengthy criminal record and the jury listened to an officer describe Schmitt's belligerent nature at the hotel.

29

"To prove a Sixth Amendment violation under Strickland a defendant must demonstrate that counsel's performance was deficient, and that this deficient performance prejudiced the defense." Vinson v. True, 436 F.3d 412, 418 (4th Cir. 2006) (internal quotation marks omitted). "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. "To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness," Wiggins v. Smith, 539 U.S. 510, 521 (2003)(internal quotation marks omitted), and the prejudice prong "requires a claimant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 694 (internal quotation marks omitted).

Schmitt contends that his trial counsel should have moved for a mistrial after the prosecution made the following inappropriate arguments to the jury during its closing argument: (1) that Schmitt possessed a stolen gun; (2) that Schmitt assaulted his girlfriend; (3) that "the system" could not be trusted to contain Schmitt; and (4) that Schmitt would enjoy amenities while in

30

prison.  Before we can determine whether any of the above statements warranted a mistrial motion, we must determine whether any of the statements were actually improper.

The first statement referencing the stolen gun was improper because the prosecution and defense had stipulated prior to trial that Schmitt possessed the gun illegally because he was a convicted felon, not because it was stolen.  The second statement, that Schmitt assaulted his girlfriend, was also inappropriate because the alleged assault was not put into evidence.  The third statement, that "the system" could not be trusted to contain Schmitt, however, was an appropriate comment.  During the defense's closing argument, Mr. Cooley argued that "there is no probability or even possibility that [Schmitt] can be a continuing serious threat to our society" because he will be "imprisoned for the rest of his natural life."  (J.A. at 344-45.)  Therefore, the prosecution's argument that "the system" could not be trusted to contain Schmitt because of Schmitt's prior deviant acts within the prison and probation systems was an acceptable rebuttal argument.  Finally, the fourth statement, that the prosecution described the amenities of prison, contained both appropriate and inappropriate comments.  During its rebuttal argument, the prosecution began to argue that if given life Schmitt <u>will</u> enjoy a life of ping pong.  Defense counsel quickly objected and the trial court instructed the jury that what the prosecution said was not evidence.  The

31

prosecution then proceeded with its argument, altering its focus just slightly by asking the jury to recall Schmitt's description of what he had enjoyed at the local prison, including the ping pong, microwaves, cable television, and canteen privileges. The second portion of the prosecution's argument was clearly acceptable because it merely reiterated irrelevant evidence previously submitted to the jury and as noted in Part II-A.

In summary, the only objectionable portions of the prosecution's argument were the mention of the stolen gun, Schmitt's assault on his girlfriend, and the reference to Schmitt playing ping pong. Defense counsel objected contemporaneously to each of the above statements, and each time the trial court issued a curative instruction. In fact, the trial court four times issued instructions in which it reminded the jury that what the lawyers said in closing argument was not to be considered evidence. We agree with the district court's conclusion that Schmitt's counsel were not ineffective for failing to move for a mistrial after each of these statements because counsel had objected and received appropriate curative instructions from the trial court. See Bennett, 92 F.3d at 1346 (finding no harm from improper prosecution argument where trial court told the jury "what the lawyers say is not evidence" and evidence of guilt was "powerful"); cf. Martin v. Grosshans, 424 F.3d 588, 591-92 (7th Cir. 2005)(finding defense counsel's performance deficient where counsel failed to move for a

32

mistrial when the prosecution's closing argument referenced Jeffrey Dahmer).

Even if we assumed, for argument's sake, that moving for a mistrial at the wrong time satisfies the deficient performance prong of Strickland, Schmitt cannot satisfy Strickland's prejudice prong. The trial court repeatedly instructed the jury that statements made in closing arguments are not evidence and, in fact, in denying Schmitt's untimely mistrial motion, the trial court noted that it presumed the jury followed its instructions. Furthermore, even if Schmitt's counsel had preserved the mistrial motion and the Virginia courts could have reviewed the prosecution's closing argument on appeal, there is no reasonable probability that Schmitt's sentence would have been reversed. The prosecutor's isolated comments regarding the stolen gun, the assault on the girlfriend, and the reference to Schmitt playing ping pong did not undermine the jury's verdict. In fact, only the reference to the assault could have been used to support the future dangerousness argument, whereas the ping pong comment does not reflect future dangerousness and the stolen gun hardly reflects future dangerousness any more than the illegal possession instruction actually given by the trial court. And more importantly, the prosecutor's comments were minuscule compared to Schmitt's prior criminal record, his two bank robberies, his drug abuse, his lack of remorse, and his deception of the local police.

33

See Bennett, 92 F.3d at 1347. Thus, there is no reasonable probability that the trial judge would have granted a timely mistrial motion based on the prosecution's comments, or that the Virginia courts would have vacated his sentence based on the same arguments. Because Schmitt has not met the Strickland prerequisites, we cannot conclude that the Virginia Supreme Court unreasonably applied the Strickland test to the facts presented.

### D. Prosecutorial Misconduct

Schmitt next contends that the improper remarks by the prosecution during closing argument were so prejudicial that they rendered the trial unfair. This claim is procedurally defaulted, and we may not review it unless Schmitt can demonstrate that ineffective assistance of counsel excuses the default. Because Schmitt cannot prevail on his ineffective assistance of counsel claim under Strickland, he also has not established cause and prejudice for excusing the default of his prosecutorial misconduct argument. See Coleman v. Thompson, 501 U.S. 722, 752 (1991) ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in Strickland v. Washington, 466 U.S. 668, (1984), we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." (internal quotation marks and alterations omitted)).

34

## E. Massiah Claim

Schmitt's fifth claim for relief is that the district court erred in concluding that his Massiah claim was procedurally defaulted. Schmitt claims that his Sixth Amendment right to counsel was violated when he telephoned Sauer from prison and Sauer, acting as a government agent, recorded the conversation and elicited incriminating statements from him. The Virginia Supreme Court found that claim procedurally defaulted because Schmitt failed to move to suppress the Sauer/Schmitt tape prior to trial as required by Virginia Code § 19.2-266.2. The district court, relying on Skipper v. French, 130 F.3d 603 (4th Cir. 1997), concluded that it was precluded from reviewing the merits of the claim because the Virginia Supreme Court found the claim procedurally defaulted on independent and adequate state grounds. Schmitt now argues that we should review the claim because (1) the trial court denied the Massiah motion on the merits and not on the basis of § 19.2-266.2; (2) the Virginia procedural default law is not regularly enforced and cannot constitute an independent and adequate state ground barring federal habeas review; and (3) that cause and prejudice excuses the failure to move to suppress the tape pretrial. We review the district court's "purely legal ruling de novo." Skipper, 130 F.3d at 609.

Schmitt presents two arguments to support his supposition that the Virginia courts decided the merits of his Massiah claim.

First, Schmitt cites to Ramdass v. Angelone, 187 F.3d 396, 409 (4th Cir. 1999) for the proposition that a defendant may preserve the substance of a constitutional claim when couching the claim under an ineffective assistance of counsel claim. Schmitt contends that because the Virginia Supreme Court reviewed the merits of his ineffective assistance of counsel claim relating to the Massiah motion, the Virginia Supreme Court necessarily decided the merits of the Massiah motion to suppress. Ramdass, however, is inapposite to the present case. Here, the issue is not whether Schmitt presented the Massiah argument to the state court (he did), but whether the Virginia Supreme Court unequivocally held that Schmitt had procedurally defaulted the claim at the trial level pursuant to an independent state ground. And contrary to Schmitt's contention, the Virginia Supreme Court, on both direct appeal and state habeas review, explicitly rejected the claim on procedural grounds because Schmitt failed to comply with the requirements of § 19.2-266.2 at trial.

Second, Schmitt contends that the denial of his Massiah motion was not procedurally defaulted, but must have been decided on the merits because the trial court accepted the motion and reviewed a transcript of the telephone call. Whether the trial court denied Schmitt's motion on the merits is, however, irrelevant to our inquiry. When we assess whether a state court has dismissed a claim on independent and adequate state grounds, "[t]he relevant

36

state court decision for purposes of the inquiry is that of the last state court to be presented with the particular federal claim at issue." Skipper, 130 F.3d at 609 (internal quotation marks omitted). Here, the Virginia Supreme Court on state habeas review declined to review the appropriateness of the trial court's denial of Schmitt's Massiah motion because it found the claim procedurally defaulted; this decision precludes our review.

Schmitt also argues that we can review his Massiah claim because § 19.2-266.2 is not an independent and adequate state ground due to its irregular enforcement. When a state court has found a claim to be procedurally defaulted on independent state grounds, "that ground must be a constitutionally 'adequate' one." Skipper, 130 F.3d at 609 (quoting James v. Kentucky, 466 U.S. 341, 348-49 (1984)). "This means that it must be a 'firmly established and regularly followed state practice.'" Id. "As a general matter, whenever a procedural rule is derived from state statutes and supreme court rules, as this one is, the rule is necessarily 'firmly established.'" O'Dell v. Netherland, 95 F.3d 1214, 1241 (4th Cir. 1996). Thus, the only disputed point is whether § 19.2-266.2 is "regularly followed."

Schmitt cites to a few unpublished Virginia opinions to support his argument. In the first case, Wheaton v. Commonwealth, No. 1409-95-2, 1997 WL 191299 (Va. Cir. Ct. Apr. 22, 1997), the Commonwealth objected to the defendant's tardy suppression motion,

37

but the trial court allowed the motion for good cause, as provided in § 19.2-266.2, and thus the Virginia Court of Appeals reviewed the merits of the suppression motion. Similarly, in Evans v. Commonwealth, No. 1963-47-2, 1998 WL 387497 (Va. Cir. App. Jul. 14, 1998), the Virginia Court of Appeals explicitly stated that the defendant failed to comply with § 19.2-266.2, but that the trial court "presumably" allowed the tardy motion because the defendant exhibited good cause. The last two cases are similarly unhelpful to Schmitt because in Sykes v. Commonwealth, 556 S.E.2d 794 (Va. Ct. App. 2001), the Commonwealth did not object to the defendants' tardy motion on § 19.2-266.2 grounds and in Neal v. Commonwealth, 498 S.E.2d 422 (Va. Ct. App. 1998), the issue of § 19.2-266.2 was not presented. In summary, Schmitt cannot produce a single published Virginia opinion in which the Virginia Supreme Court or the Virginia Court of Appeals has ignored the dictates of § 19.2-266.2 when properly presented.[11]

In contrast to the unpublished cases cited by Schmitt, Virginia courts have recognized that the word "shall" in § 19.2-266.2 makes the pretrial filing of suppression motions "mandatory."

---

[11]Moreover, even if Schmitt could direct us to a Virginia case excusing compliance with § 19.2-266.2 "one decision does not likely establish 'inconsistent application' of a procedural rule. 'An occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate.'" Coleman v. Mitchell, 268 F.3d 417, 429 (6th Cir. 2001)(quoting Amos v. Scott, 61 F.3d 333, 342 (5th Cir. 1995)).

See Upchurch v. Commonwealth, 521 S.E.2d 290, 291 (Va. Ct. App. 1999). The Upchurch court concluded that enforcement of § 19.2-266.2 is necessary because it preserves the Commonwealth's right to appeal an adverse suppression ruling. The pretrial filing of a suppression motion is key because the state "may not appeal an erroneous suppression ruling after the jury is impaneled and sworn in a jury trial." Id. at 292. Thus, "[t]he justification for the requirement of a pretrial suppression motion is readily apparent in light of the Commonwealth's limited right to appeal an adverse suppression ruling." Id.

In summary, the Virginia Supreme Court rejected Schmitt's Massiah claim on an independent and adequate state ground that is firmly established and regularly followed in Virginia. Thus, we cannot review the merits of the Massiah claim unless Schmitt's final argument that cause and prejudice in the form of ineffective assistance of counsel excused the procedural default. See Vinson, 436 F.3d at 417 ("federal habeas courts may not review procedurally barred claims unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law" (internal quotation marks omitted)).

    F.    Ineffective Assistance Relating to Massiah Claim

Schmitt's third and final attempt to have us review the merits of his Massiah claim is that ineffective assistance of counsel excused the procedural default. Because Schmitt raised this claim

39

in his state habeas proceedings and the Virginia Supreme Court decided the merits of this ineffective assistance of counsel claim, we review its decision pursuant to the strictures of 28 U.S.C.A. § 2254. And as set forth in Part II-C, the Strickland standard governs our review of the ineffective assistance of counsel claim.

On state habeas review, the Virginia Supreme Court found no Massiah violation occurred because Sauer was not a government agent and Schmitt's ineffective assistance of counsel claim necessarily failed because Schmitt could not have successfully suppressed the tape. As noted earlier, the district court, after conducting an evidentiary hearing, disagreed with the Virginia Supreme Court and found that Sauer functioned as a government agent when he taped the phone call. Therefore, the conversation violated Schmitt's Sixth Amendment right to counsel, as established in Massiah.[12] Nevertheless, the district court concluded that Schmitt's counsel's failure to move to suppress the tape pre-trial did not constitute ineffective assistance of counsel because it was a reasonable tactical decision made by defense counsel.

Schmitt puts forward three arguments for why defense counsel's performance was objectively unreasonable: (1) defense counsel should have recognized that they could not place the tape into

---

[12]As previously mentioned, the Commonwealth has not appealed the district court's finding that Schmitt was acting as a government agent.

40

evidence during the guilt phase pursuant to Virginia law; (2) defense counsel should have filed a pretrial motion in limine to determine whether the tape would be admitted as an exception to the hearsay rule by the prosecution; and (3) defense counsel "failed to fully appreciate the value of the Schmitt/Sauer tape to the prosecution at the penalty phase." (Appellant's Br. at 72.)

At the outset, we briefly review the facts facing Schmitt's counsel prior to trial. It was without question that Schmitt committed the robbery and the murder; the only point truly at issue was whether Schmitt committed capital murder. Prior to trial, the prosecution provided Schmitt's counsel with a transcript of the Sauer/Schmitt telephone call. From the transcript, Schmitt's counsel quickly ascertained that the prosecution could use the tape during the guilt and sentencing phases because the tape contained inculpatory statements by Schmitt and showed a lack of remorse. Schmitt told Sauer that he robbed the bank and that he did not abandon the robbery when the security guard approached him because he was "committed" to the robbery. (J.A. at 211.) Schmitt also stated that the security guard's "eyes got real big" when he saw Schmitt's gun.

Moreover, Schmitt's counsel knew that the bank surveillance tape did not depict the shooting and that none of the bank employees could testify to how the shooting occurred. In fact, Schmitt was the only person who could testify to how the shooting

41

occurred and his phone call to Sauer, whom he believed at the time was his friend, provided a believable version of the facts. To the defense's benefit, Schmitt described in detail the struggle between himself and the security guard and how he did not intend to kill the guard. The tape also revealed Schmitt's humane side because he repeatedly expressed concern over his friends that had been implicated in the robbery. Schmitt's defense counsel also knew that if the jury convicted Schmitt on the capital murder charge, they could still successfully have Lt. Clarcq testify to the remorse Schmitt felt after the murder and how Schmitt did not intend to kill the security guard. In essence, Schmitt's counsel recognized that the worst-case scenario was that the prosecution would not introduce the Sauer/Schmitt tape during the guilt phase, but choose to introduce it during the sentencing phase. Even with that possibility (which bore true), Schmitt's counsel determined that the most sound decision was to not make any move toward the suppression of the one piece of evidence that could have exculpated Schmitt from the capital murder charge.

Schmitt's argument that his counsel were ineffective for failing to recognize that they could not place the tape into evidence during the guilt phase is without merit because Schmitt's trial counsel were experienced lawyers with a full grasp of the relevant law and facts. Mr. Collins expressly stated that "the status of law in Virginia is that if a defendant makes inculpatory

statements, that's admissible against his penal interest.  However, if he makes exculpatory statements, that is not admissible."  (J.A. at 1095.)  Schmitt's trial counsel, recognizing that Schmitt made inculpatory statements on the tape, reasonably believed that the Commonwealth would move the tape into evidence during the guilt phase and, accordingly, believed that they need not worry about the fact that they could not enter it into evidence.  Because this court must assess the reasonableness of Mr. Collins's conduct at the time he chose not to move to suppress the tape and because Mr. Collins's decision was based on a full grasp of the facts and the relevant law, we cannot say that his decision was objectively unreasonable.  See Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Schmitt's argument that his attorneys should have filed a pretrial motion in limine also carries little force.  The essence of this argument is that Schmitt's counsel could have proceeded in an elaborate scheme by filing a motion in limine on the admissibility in the guilt phase of the transcript of the call between the crisis negotiator, Lt. Clarcq, and Schmitt on the night of his arrest.  According to Schmitt, this motion would have served as a "stalking horse" to determine the outcome if a similar motion was filed on the more crucial Sauer/Schmitt tape.  Schmitt argues that if the motion in limine on the Clarcq transcript failed,

43

defense counsel could have moved to suppress the Sauer/Schmitt tape.

Schmitt is correct that the filing of a motion in limine may have shed some light on the risk that his attorneys were taking by failing pretrial to move to suppress the Sauer/Schmitt tape. Nevertheless, this argument misses the mark. Mr. Collins and Mr. Cooley were well-aware that they stood on solid footing for suppressing the Sauer/Schmitt tape and that they probably could not move the Sauer/Schmitt tape into evidence during the guilt phase on their own. Defense counsel, however, chose not to move to suppress the Sauer/Schmitt tape because the tape was the most convincing guilt phase evidence that Schmitt accidentally shot the security guard. In fact, Schmitt's attorneys testified that any pretrial motion relating to the Sauer/Schmitt tape or the crisis negotiator transcript would have tipped off the prosecution that the defense wanted to use the tapes during the guilt phase and thus encouraged the prosecution not to submit the Sauer/Schmitt tape during the guilt phase. Admittedly, Mr. Cooley testified that, in hindsight, he would have filed a pretrial motion to suppress the Sauer/Schmitt tape at the penalty phase while simultaneously seeking admission of the tape at the guilt phase. Even with the acceptance of Mr. Cooley's statement that he should have filed a bifurcated motion as a reasonable defense strategy, that acceptance does not render the trial strategy actually instituted by Mr. Cooley objectively

44

unreasonable. In hindsight, almost every lawyer, whether he has won or lost, recognizes that he could have improved upon some part of his performance at trial, but that honest recognition does not necessarily mean that his performance was constitutionally ineffective. We agree with the district court that

> Counsel's best hope for admitting the most direct and clear evidence of Schmitt's only defense to the capital murder charge rested in the prosecution's introduction of the Sauer tape in the guilt phase of the trial. Measured from that perspective and considering the reasonably perceived costs and the significant potential benefits, the decision made by counsel was not "outside the wide range of professionally competent performance" to forego a pretrial motion to suppress the tape at issue.

(J.A. at 1564 (quoting Strickland, 466 U.S. at 490).) As such, Schmitt's counsel were not ineffective for failing to file a motion in limine before trial.

Finally, Schmitt contends that his trial counsel were ineffective because they failed to fully appreciate how damaging the Sauer/Schmitt tape would be at the sentencing phase. As we have repeatedly noted, Schmitt's counsel well understood the double-edged nature of the Sauer/Schmitt tape. (J.A. 1103 (Mr. Collins noting that the Sauer/Schmitt tape was "more harmful than beneficial" at the sentencing phase).) However, they reasonably believed that the best defense to a death sentence would be a strong defense during the guilt phase using the Sauer/Schmitt tape and they had good reason to believe that the prosecution might move the tape into evidence. Furthermore, when confronted with the fact

45

that the tape was admitted only at the sentencing phase, Schmitt's trial counsel made the best of a bad situation by using the Sauer/Schmitt tape to defeat the vileness aggravating factor proposed by the prosecution. Thus, it is possible that the suppression of the Sauer/Schmitt tape could have resulted in the jury finding present both the vileness and future dangerousness factors. Schmitt's trial counsel effectively weighed the "trade-off" between suppressing the tape and allowing the prosecution to use the tape in the sentencing phase; although in hindsight their decision did not bear fruit, the decision to forego moving to suppress the tape was an objectively reasonable choice. Accordingly, the Virginia Supreme Court's rejection of this ineffective assistance of counsel claim was not unreasonable, and we may not review the merits of Schmitt's Massiah claim.

## III.

Although we conclude that the prosecution's missteps in this case did not affect the outcome of the trial, we emphasize that the intentional suppression of impeachment material and other prosecutorial misconduct should not be taken lightly. The Supreme Court has long emphasized the special role that prosecutors play in our judicial system. See Banks, 540 U.S. at 696 (compiling cases). And we could not agree more with the district court's conclusion that this prosecution team displayed a disconcerting lack of respect for its sole responsibility to ensure "that justice shall

46

be done," as opposed to merely winning the case.  <u>Kyles</u>, 514 U.S. at 439 (internal quotation marks omitted).  We strongly encourage the state prosecution team to revisit and review its obligations under Virginia state law and constitutional law, especially in light of the fact that the misconduct was not confined to a single incident.

IV.

For the foregoing reasons, the judgment of the district court is

<u>AFFIRMED</u>.